Baudilio Rivera, peticionario, *v.* Junta de Relaciones del Trabajo, recurrida; Autoridad de Transporte de Puerto Rico, interventora.

Núm. 9.—*Sometido:* Abril 20, 1949. *Resuelto:* Julio 26, 1949.

*Víctor M. Bosch* y *David Curet Cuevas,* abogados del peticionario; *Hon. Procurador General Vicente Géigel Polanco* (*Luis Negrón Fernández, Ex Procurador General,* en el alegato), *A. Torres Braschi, Procurador General Auxiliar, Yamil Galib Frangie, Procurador General Auxiliar Especial* y *Luis G. Estades,* abogado éste y el anterior de la Junta, abogados todos de la recurrida; *Víctor Gutiérrez Franqui* y *Lino J. Saldaña,* abogados de la interventora; *Enrique Cornier Martínez,* abogado de la Unión de Chóferes y Mecánicos núm. 1 de San Juan y Ramas Anexas, Inc.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Baudilio Rivera, chófer de la Autoridad de Transporte de Puerto Rico y miembro de la Unión de Chóferes y Mecánicos Núm. 1 de San Juan y Ramas Anexas Inc., se declaró

"culpable con derecho a declarar", ante la Junta Directiva de la Unión, de una querella radicada en su contra por Rafael Rosas, compañero suyo de trabajo y submárshal de la mencionada Unión. En la querella se le imputaba a Rivera haber agredido a Rosas causándole daños por los cuales tuvo que ser recluído en un hospital. La Junta Directiva de la Unión le impuso a Rivera una multa de $100 la cual debería pagar a Rosas para cubrir los gastos de hospital. No habiendo pagado la multa dentro del término de 30 días concedídole, la Unión lo expulsó de su matrícula el 19 de julio de 1946. La Autoridad de Transporte fué notificada de la acción tomada por la Junta Directiva de la Unión y cumpliendo con las disposiciones del convenio colectivo existente entre la Unión y la Autoridad de Transporte despidió al peticionario el primero de agosto de 1946.

El día 30 de octubre de 1946, Rivera apeló ante la Asamblea General de la Unión y la orden emitida por la Junta de Directores fué confirmada. Rivera, después de solicitar la inhibición de la Junta de Directores, solicitó que se reconsiderara el acuerdo de la Asamblea General, y ésta, después de él comprometerse a pagar los $100 de multa, acordó darle una última oportunidad y aceptarlo de nuevo como miembro de la Unión.

Meses después, al solicitar la Autoridad de Transporte de la Unión que le enviaran candidatos para chóferes de acuerdo con las disposiciones del convenio colectivo celebrado entre ellos, rechazó el de Rivera, a quien de aquí en adelante llamaremos el peticionario, alegando que la conducta conocida por la Autoridad a través de los récords del Comité de Quejas y Agravios, lo hacía inaceptable para ocupar el puesto de chófer en la Autoridad de Transporte.

El día 12 de septiembre de 1948 el peticionario, amparándose en el artículo 9 de la Ley de Relaciones del Trabajo, o sea la Ley núm. 130 de 8 de mayo de 1945 (pág. 407), según enmendada por la Ley núm. 6 de 7 de marzo de 1946 ((1)

pág. 19), se querelló ante la Junta de Relaciones del Trabajo de Puerto Rico imputándole—tanto a la Unión como a la Autoridad de Transporte—la comisión de ciertas prácticas ilícitas de trabajo. A la Unión le imputó haber violado el artículo 8(2)(b) y a la Autoridad de Transporte el artículo 8(1), incisos (a), (f) e (i) de la mencionada ley.

La Junta designó a un Oficial Examinador, (1) procediendo éste a celebrar una vista, después de la cual emitió un informe concluyendo que tanto la Unión como la Autoridad habían incurrido en las prácticas ilícitas alegadas y recomendando a la Junta que emitiese una orden contra ambas entidades ordenándoles cesar y desistir de dichas prácticas ilícitas.

La Unión aceptó el informe rendido por el Oficial Examinador pero no así la Autoridad de Transporte, la cual se opuso al mismo solicitando que se desestimara la querella radicada en su contra. La Junta, basándose en todo el expediente del caso, emitió una decisión y orden desestimando la querella del peticionario en cuanto a ambas entidades.

No conforme el peticionario, solicita de este Tribunal que revise la orden final emitida por el mencionado organismo.(2)

En su primer señalamiento alega el peticionario que erró la Junta al exonerar a la Unión de las responsabilidades que le fijara el Oficial Examinador en su informe, pues no habiendo la Unión impugnado el mismo, la Junta estaba impedida de tomar acuerdo alguno revocándolo. No tiene razón. Las recomendaciones de un Oficial Examinador no son concluyentes para la Junta. Su función consiste en celebrar audiencias públicas a las cuales comparecen las partes con sus testigos y, una vez terminada la prueba, rendir un informe detallado a la Junta expresándole su recomendación de acuerdo con la evidencia y la ley aplicables. Pero su informe no pasa de ser una mera recomendación la cual la

---

(1)Por orden de la Junta ambos casos fueron consolidados para fines de audiencia y decisión.

(2)Artículo 9 de la Ley de Relaciones del Trabajo.

Junta, de acuerdo con la ley que la creó y con su propio reglamento, tiene discreción para alterar.([3])

El hecho de que una parte no radique oposición al informe rendido por el Oficial Examinador no significa que dicho informe sea final y obligatorio para la Junta pues es la Junta la que en última instancia está obligada por ley a determinar si se ha cometido o no una práctica lícita de trabajo. · *National Labor Relations Board* v. *Elkland Leather Co.*, 114 F.2d 221 (C.C.A. 3, 1940), *certiorari* denegado en 311 U.S. 705; *International Ass'n. Etc.* v. *National Labor Relations Board*, 110 F.2d 29 (C.A., D.C., 1939); *National Labor Relations Board* v. *Oregon Worsted Co.*, 94 F.2d 671 (C.C.A. 9, 1938).

Como se dijo en el caso de *Elkland Leather Co.*, supra, en el cual tampoco se impugnaron ciertas conclusiones del oficial examinador:

". . . Ciertas conclusiones sugeridas por el oficial examinador en su informe a las cuales no se tomó excepción fueron sin embargo revocadas por la Junta la cual hizo conclusiones independientes contrarias

---

([3])El artículo 9(1)(*b*) de la Ley dispone:

"Las declaraciones tomadas por dicho miembro, agente o agencia o por la Junta en las audiencias se pondrán por escrito y se archivarán en la Junta. Más adelante, *la Junta podrá a discreción tomar declaraciones adicionales u oír alegaciones.* Si de acuerdo con todas las declaraciones prestadas *la Junta fuere de opinión* de que cualquier persona, patrono u organización obrera expresados en la querella se ha dedicado o se dedica a cualquier práctica ilícita de trabajo, entonces la Junta manifestará sus conclusiones de hecho y de ley y expedirá orden y hará que la misma se le notifique a dicha persona, patrono u organización obrera, requiriéndolo que cese en y desista de dicha práctica ilícita de trabajo y tome tal acción afirmativa que permita efectuar los propósitos de esta Ley, incluyendo, pero no limitándose a la reposición de empleados, abonándose o no la paga suspendida, fijando o remitiendo por correo los avisos apropiados, y poniendo fin a convenios colectivos, en todo o en parte, o cualquier otra orden contra tal persona, patrono, parte u organización obrera, que permita efectuar los propósitos de esta Ley. La orden podrá además requerir de tal persona, patrono u organización obrera que rinda informe de tiempo en tiempo, demostrando hasta qué punto ha cumplido con la misma. *Si de acuerdo con las declaraciones tomadas la Junta fuere de opinión que ninguna persona de las expresadas en la querella se ha dedicado o se dedica a cualquier práctica ilícita de trabajo, entonces la Junta hará sus conclusiones de hecho y expedirá una orden desestimando la querella.*" (Bastardillas nuestras.)

a las mismas. Se arguye que esto constituye error. El argumento hace caso omiso del hecho de que la Ley (29 U.S.C.A. sec. 160(c)) impone a la Junta misma el deber de exponer sus conclusiones de hecho. Ese deber ella no puede delegarlo en un oficial examinador sino que debe considerar su informe intermedio, como lo hizo la Junta en este caso, como nada más que una recomendación. . . ."

Es de notarse que, de acuerdo con la sección 10(c) de la Ley Nacional de Relaciones del Trabajo según quedó enmendada por la Ley Taft-Hartley, 29 U.S.C.A. sec. 160(c), actualmente el informe y recomendación de un oficial examinador radicado en la Junta Nacional se convierte en la orden de la Junta, ". . . si no se radicaran excepciones dentro de veinte días después de haberse notificado a las partes, o dentro de la prórroga concedida por la Junta . . ." Nuestra Ley, sin embargo, no ha sido enmendada y la jurisprudencia citada, interpretando la ley federal antes de la enmienda por la Ley Taft–Hartley, es aplicable. No se cometió el primer error.

▉▉ Por el segundo se alega que erró la Junta al resolver que la Unión no cometió una práctica ilícita del trabajo al suspender de su martícula al peticionario. Arguye el peticionario que la Unión carecía de facultad para castigarlo, pues ya había sido castigado por el Comité de Quejas y Agravios de la Autoridad; que el Reglamento de la Unión no le daba poderes para imponerle el pago de una multa de $100; que la Unión no podía expulsarlo por no haber pagado la misma y por último que la expulsión fué injustificada.

El artículo 8(2)(b) de la Ley, supra, dispone:

"(2) Será práctica ilícita de trabajo el que una organización obrera, actuando individualmente o concertadamente con otros:

"(a) *      *      *      *      *      *      *

"(b) Excluya o suspenda injustificadamente de la matrícula de una organización obrera a cualquier empleado en una unidad de negociación colectiva y en cuya representación la organización obrera haya firmado un convenio de afiliación total, o de mantenimiento de matrícula de la unión. Por la violación de este inciso, la Junta podrá, en el ejercicio de su discreción, ordenar la suspensión temporal o la terminación de la cláusula del convenio colectivo que

requiera de todos los empleados dentro de tal unidad, como condición de empleo, que pertenezcan a una sola organización obrera, o que los miembros de dicha organización se mantengan al día como miembros de la misma durante la vigencia del contrato.''

Esta disposición no estaba incluída entre las prácticas ilícitas de trabajo del artículo 8(2) de la ley original (Ley núm. 130 de 1945) y tampoco existía ni existe disposición similar en las leyes federales, Wagner y Taft–Hartley, aunque en esta última, al enmendarse la sección 8 (29 U.S.C.A. sec. 158, 1948 *Cumulative Annual Pocket Part,* pág. 18) se incluyó el apartado (*b*) en el cual se enumeraron por primera vez los casos en que las organizaciones obreras o sus agentes pueden incurrir en prácticas ilícitas de trabajo.

Nuestra Ley, más comprensiva que la Federal, ha querido afrontar un problema que ha sido objeto de muchas y enconadas discusiones en los Estados Unidos, o sea el cada día más poderoso control de las uniones obreras sobre sus miembros y al mismo tiempo la renuencia del gobierno y de las cortes a intervenir con la administración interna de dichas uniones.(⁴) La Ley Taft–Hartley—tan combatida por las organizaciones obreras—aun cuando aparentemente no interviene con la forma en que ellas pueden disciplinar a sus miembros al disponer en su sección 8(*b*)(1) que ''. . . este párrafo no menoscabará el derecho de una organización obrera a adoptar sus propias reglas en cuanto a la adquisición o retención de miembros en la misma. . .'', de hecho ha limitado las consecuencias de la sanción disciplinaria que se

---

(⁴)Para extensos y muy interesantes trabajos sobre esta cuestión, véanse *The Internal Affairs of Associations not for Profit* por Z. Chafee, Jr., 43 Harv. L.Rev. 993; *The Elements of a Fair Trial in Disciplinary Proceedings by Labor Unions,* 30 Col. L. Rev. 847; *The Control of Labor Through Union Discipline* por Miller D. Steever, 16 Cornell L.Q. 212; *Civil Liberties and the Trade Union* por T. R. Witmer, 50 Yale L.J. 621; *Disputes Within Trade Unions* por W. W. Stafford, 45 Yale L.J. 1248; *Equitable Relief Against Defamation and Injuries to Personality* por Roscoe Pound, 29 Harv. L. Rev. 640, a las págs. 677 *et seq.; The Power of Trade Unions to Discipline Their Members,* 96 U. of Pa. L. Rev. 537 y *Some Aspects of Employee Democracy Under the Wagner Act* por J. M. Murdock, 32 Cornell L. Q. 73.

imponga a un miembro, al abolir el taller cerrado y restringir el taller unionado y disponer en la sección 8(a)(3) en lo pertinente, que ". . . ningún patrono justificará cualquier discrimen en contra de un empleado por no ser miembro de una organización obrera . . . si tiene motivos razonables para creer que su calidad de miembro fué . . . terminada por otras razones que la falta del empleado de pagar las cuotas regulares . . . requeridas como condición para . . . retener la calidad de miembro . . .", en relación con la sección 8(b)(2) que dispone que será una práctica ilícita de trabajo por parte de una organización obrera "el causar o tratar de causar que un patrono discrimine en contra de un empleado en violación del inciso (a)(3) . . . con respecto al cual su calidad de miembro en tal organización ha sido . . . terminada por algún otro motivo que su falta de pago de cuotas regulares . . . uniformemente requeridas como condición para . . . retener dicha calidad de miembro . . ."

El artículo 8(2)(b) de nuestra Ley no define qué es lo que constituye excluir o suspender injustificadamente a un empleado de la matrícula de una organización obrera. Su determinación ha sido dejada en manos de la Junta al disponerse en el artículo 7 de la ley, supra, que:

"(a) La Junta tendrá facultad, según se dispone más adelante en la presente, para evitar que cualquier persona se dedique a cualesquiera de las prácticas ilícitas de trabajo que se enumeran en el artículo 8. Esta facultad será exclusiva y no la afectará ningún otro medio de ajuste o prevención."

La razón es obvia. Se creó un organismo especializado y entendido en materia de relaciones del trabajo para que se encargara de desarrollar y velar por el cumplimiento de la política pública del Pueblo de Puerto Rico expuesta en el artículo 1 de la ley. Corresponde, por tanto, a la Junta determinar en primera instancia y de acuerdo con los hechos de cada caso en particular, lo que es una "expulsión o suspensión injustificada" de acuerdo con el artículo 8(2)(b).

La misma ley que creó la Junta confiere jurisdicción a este Tribunal para poner en vigor o revisar sus órdenes finales, concediendo o negando el remedio solicitado. Sección 9 (2) (*a*) y (*b*) de la Ley. Empero, expresamente se dispuso en dicha sección que "las conclusiones de la Junta en cuanto a los hechos, *si están respaldadas por la evidencia,* serán en igual forma concluyentes" para este Tribunal. (Bastardillas ,nuestras.) Nuestra intervención en cuanto a las conclusiones de hecho a que llegó la Junta está limitada a determinar si hay evidencia suficiente para sostenerlas. Como dijimos en el caso de *Junta de Relaciones del Trabajo* v. *Namerow,* 69 D.P.R. 82, 87:

". . . Sólo en caso de que el récord no contenga evidencia en apoyo de las conclusiones de hecho a que llegue la Junta, estaríamos autorizados para resolver, como cuestión de derecho, que las conclusiones de hecho, y la orden en éstas basada, no pueden subsistir."

Y al mismo efecto, *Sunland Biscuit Co.* v. *Junta de Salario Mínimo,* 68 D.P.R. 371, 376, 378; *United States* v. *Morgan,* 307 U.S. 183; *Board* v. *Hearst Publications,* 322 U.S. 111 y *Medo Corp.* v. *Labor Board,* 321 U.S. 678.

Hemos examinado la prueba que tuvo ante su consideración la Junta y sobre la cual hubo además una estipulación de las partes y, a nuestro juicio, la misma es suficiente para sostener sus conclusiones sobre los hechos, los cuales ya hemos expuesto anteriormente. Ahora bien, la cuestión de derecho planteada por el peticionario es al efecto de que la Junta erró al sostener que la Unión tenía autoridad bajo el artículo VI, secciones A y F de su Reglamento(5) para im-

(5)Dichos incisos disponen:

"Sección A: Todo socio que revelase *falta de respeto y consideración, injurias,* propaganda desleal y viciosa *en contra de sus compañeros* y oficiales o en contra de la Unión se le formularán cargos ante la Junta Directiva. Al efecto la Junta realizará una investigación de los hechos y *si se comprobasen tales faltas ésta le impondrá las sanciones correspondientes de acuerdo con el caso y la misma será efectiva.* El mismo será resuelto de acuerdo a sus méritos. *Entendiéndose* que si la sanción que le sea impuesta por la Junta Directiva o

ponerle la sanción que le impuso. La Junta, al sostener la decisión de la Unión, se expresó en esta forma:

". . . creemos que la Unión tenía autoridad, dentro de las facultades de que disfruta como sociedad privada y en armonía con su propio reglamento, para imponer la adecuada disciplina a sus miembros. Creer y encontrar lo contrario sería obstaculizar o por lo menos no facilitaríamos la adecuada organización y disciplina de una organización obrera y nos apartaríamos del propósito básico que tuvo la Legislatura al promulgar la Ley de Relaciones del Trabajo de Puerto Rico. Una organización obrera capaz de mantener, en forma democrática y reglamentaria, la disciplina entre sus miembros, está coadyuvando al propósito de mantener la paz industrial. La imposición de medidas razonables de disciplina y el exigir responsabilidad a sus miembros son factores necesarios para hacer de una organización obrera una entidad responsable y fuerte que sirva de instrumento económico verdaderamente efectivo en el mantenimiento de la armonía y·la comprensión entre capital y trabajo. Si restáramos autoridad a una organización obrera para tomar aquellas medidas internas necesarias al mantenimiento del más alto grado de cohesión, responsabilidad y disciplina entre sus asociados, no estaríamos efectuando a cabalidad los propósitos del estatuto que administramos. Ya hemos expresado nuestro propósito de intervenir lo menos posible, en las cuestiones internas de las organizaciones obreras. Esto no significa, sin embargo, que estamos dando mano libre a las organizaciones obreras para, a su capricho y absoluta discreción, imponer a sus miembros medidas irrazonables, que éstos no puedan cumplir y, como consecuencia, sus empleos queden afectados.

"Pero no se trata aquí de un caso de esos aislados en que la Unión obrera se extralimita en el uso de su discreción y facultad. Se trata de uno de esos casos en que el único tribunal competente para determinar e imponer la sanción, determinó cuál era la disciplina que debía imponerse a un asociado suyo. Y para que una organización obrera obtenga el mayor buen éxito en la negociación colectiva y en la función principal que debe desempe-

consejo no estuviera a satisfacción del socio éste podrá solicitar una revisión de su caso ante una asamblea general."

"Sección F: Será deber de todo miembro usar la disciplina tanto en la Unión como en sus labores. Se entenderá que la falta de ésta es una violación a los principios fundamentales de esta constitución *y está sujeta a la multa y penalidades que a tal fin impongan los miembros de la Junta Directiva.*" (Bastardillas nuestras.)

ñar en el campo de la producción, debe tener, indiscutiblemente, el poder de controlar y orientar a sus miembros, y hacer que' éstos cumplan sus obligaciones contractuales y reglamentarias. El hecho de si la multa impuesta al obrero Baudilio Rivera fué para ingresarla en los fondos de la Unión o fué para indemnizar a un miembro perjudicado, es inmaterial. Si la Unión tenía autoridad para imponer la sanción, también tenía autoridad para determinar su destino. Y no puede alegarse por Baudilio Rivera que no se le dió un debido procedimiento como miembro de la Unión, cuando éste aceptó todos los hechos y no presentó defensa alguna. Al declararse culpable de los cargos que le formularon, Baudilio Rivera se sometió voluntariamente al tribunal de su propia organización de la cual era miembro y aceptó los cargos, y ésta actuó con jurisdicción al imponerle un castigo de cien dólares.

"En consecuencia, Baudilio Rivera debió haber cumplido con la obligación que le impuso la Unión, y su negativa a acatarla o su falta de cumplimiento con los términos de la misma, dió motivos suficientes a la Unión para que ésta tomara en ley aquellas medidas adicionales que creyó apropiadas, incluyendo su exclusión de la matrícula."

¿Debemos resolver, como cuestión de ley, que la Junta erró al sostener, basada en los fundamentos expuestos por ella, que la suspensión definitiva del peticionario de la matrícula de la Unión no fué injustificada?

Nos confrontamos por primera vez con la pauta o norma que debemos establecer para determinar si la Junta erró al resolver qué es lo que constituye una suspensión o expulsión "injustificada" de un empleado de la matrícula de la organización obrera a que pertenece. Como cuestión de derecho resolvemos que no erró la Junta al sostener la facultad de la Unión, bajo los incisos A y F del artículo VI de su Reglamento, supra, de imponer $100 de multa al peticionario y destinarlos a pagar los gastos en que incurrió el compañero herido por él. De hecho la prueba demostró que el peticionario sugirió que se le diera ese destino a la multa y además de haber aceptado los hechos que se le imputaron, convino en satisfacer dicha multa en pagos parciales de $5. Fué su actitud de no cumplir con la sanción impuesta, a pesar de

haberla aceptado, lo que motivó la actuación adicional de la Unión suspendiéndolo definitivamente. Tampoco erró la Junta, a nuestro juicio, al resolver que bajo el citado artículo del Reglamento la Unión podía imponer esa penalidad adicional. ¿En qué forma puede la Unión hacer cumplir sus sanciones a menos que sus miembros sepan que de no cumplirlas pueden ser suspendidos o expulsados?

Por otra parte, la Junta de Relaciones del Trabajo es la llamada a determinar qué es lo que constituye una práctica ilícita de trabajo de acuerdo con los hechos probados en cada caso en particular. Y es a ella, en primera instancia, a quien correspondía resolver si la Unión incurrió en dicha práctica ilícita en este caso por haber expulsado al peticionario "injustificadamente".

No se nos entienda como sosteniendo que en cuestiones legales estamos obligados por las determinaciones de la Junta. Sólo resolvemos que en un caso como el presente en el cual está envuelta la determinación de si la Unión ha incurrido en una práctica ilícita de trabajo, los hechos probados (incluyendo las admisiones del peticionario que equivalen a una renuncia a impugnar los procedimientos ante la Unión, *Strobel* v. *Irving*, 14 N.Y.S.2d 864) justifican la conclusión a que llegó la Junta, basada en los fundamentos que expuso.

■ Sostiene además el peticionario que la Junta erró al resolver que la Autoridad de Transporte no cometió una práctica ilícita de trabajo al despedirlo de su empleo.

El inciso I del artículo III del Convenio Colectivo entre la Unión y la Autoridad dispone que:

"Sección I.—En todos aquellos casos que la Unión resuelva expulsar a uno de sus miembros, empleado en la Autoridad como chófer u obrero del taller, la Autoridad, en cumplimiento de lo que dispone la Sección 'A' de este mismo artículo, separará del trabajo a dicho chófer u obrero del taller, *Disponiéndose,* que si el chófer u obrero del taller llevara en apelación su caso ante la Junta Insular de Relaciones del Trabajo o cualquier Tribunal de Justicia competente y la decisión de cualquiera de estos Organismos fuera adversa

a la acción tomada por la Autoridad, la Unión estará obligada a reembolsar a la Autoridad la cuantía de la indemnización que ésta hubiere pagado al obrero querellante como resultado de sentencia en firme, dictada por los mencionados organismos.''

La sección A dice:

''Sección A.—La Autoridad y la Unión convienen en no utilizar los servicios de ningún chófer u obrero del taller empleado en las diversas actividades de la División de Autobuses que no esté afiliado a la Unión, con excepción de los empleados clasificados como 'Ejecutivos y Administrativos.''

Al ser suspendido([6]) definitivamente el peticionario, la Unión se dirigió a la Autoridad en la siguiente forma:

''Tenemos el gusto de enviarle adjunta copia de carta que fué enviada por esta Unión al Sr. Baudilio Rivera, suspendiéndole definitivamente de los derechos de la Unión por no cumplir con la sanción impuéstale por la Junta Directiva después de encontrarle culpable de haber violado el reglamento de la Unión.

''Lo que le comunicamos para *su conocimiento y acción.''* (Bastardillas nuestras.)

¿Qué acción podía tomar la Autoridad bajo el Convenio Colectivo sino despedir al peticionario? No competía a la Autoridad, bajo los hechos de este caso, investigar y determinar si la suspensión definitiva decretada por la Unión estaba justificada o no. Esa misión está encomendada a la Junta por el artículo 8(2)(b). Ahora bien, el artículo 8(1)(i) de la ley dispone que será práctica ilícita de trabajo el que un patrono ''Deje de emplear o reponer a su antigua posición y de no existir ésta a otra posición sustancialmente equivalente a la anterior, a un empleado despedido en violación al Artículo 8(2)(b).'' Esta disposición presupone que la Junta haya resuelto, bajo el artículo 8(2)(b), supra, que la organización obrera excluyó o suspendió injustificadamente de su matrícula a un empleado. No creemos que fuera la intención legislativa el conceder al patrono, bajo los hechos

([6]) El Presidente de la Unión declaró que suspensión definitiva era lo mismo que expulsión definitiva.

del presente caso, el poder de investigar y luego determinar si la actuación de la organización obrera, con quien ha firmado un convenio colectivo a base de taller cerrado, al excluir un miembro de su matrícula lo fué justificadamente o no. Recalcamos que hemos dicho "bajo los hechos del presente caso" porque pueden surgir situaciones en que el patrono no esté obligado a cumplimentar ciegamente la petición de la Unión, y si lo hace, incurre en una práctica ilícita de trabajo. Especialmente es esto así cuando el patrono tiene o puede tener conocimiento de que la actuación de la Unión no admitiendo o expulsando a un miembro lo ha sido en violación de los derechos reconocidos a los obreros por la Ley de Relaciones del Trabajo. Véanse los casos de *Local No. 2880, etc.* v. *National Labor Relations Board,* 158 F.2d 365 (C.C.A. 9, 1946), *certiorari* concedido en 331 U.S. 798 y archivado a moción de la peticionaria en 332 U.S. 845; *Wallace Corp.* v. *Labor Board,* 323 U.S. 248; *National Labor Relations Board* v. *American White Cross Lab.,* 160 F.2d 75 (C.C.A. 2, 1947); *Colonie Fibre Co.* v. *National Labor Relations Board,* 163 F.2d 65 (C.C.A. 2, 1947); *Steele* v. *L. & N.R. Co.,* 323 U.S. 192 y *Tunstall* v. *Brotherhood,* 323 U.S. 210 y Anotaciones relacionadas en 95 A.L.R. 10; 97 A.L.R. 609; 160 A.L.R. 918; 166 A.L.R. 356 y 172 A.L.R. 1351.

Pero ésa no es la situación en el presente caso. Aquí la Junta resolvió que, de acuerdo con la prueba, la Autoridad despidió al peticionario a requerimiento de la Unión y que "Tal acto estuvo predicado en una de las obligaciones contenidas en el convenio colectivo con la Unión. De haber la Autoridad actuado contrario a lo que disponía el convenio con la Unión se exponía a que se le imputara la comisión de otras prácticas ilícitas de trabajo y se exponía además al quebrantamiento o debilitamiento de las relaciones entre ella y la Unión." Concluyó "que la Autoridad, al despedir al referido empleado a requerimiento de la Unión, por haber éste perdido su condición de miembro en buen estado (*good*

*standing*), actuó dentro de las facultades administrativas y obligaciones contractuales que tenía, y, tal acto, no constituyó violación alguna al artículo 8(1)(*i*) de la ley."(⁷)

De nuevo resolvemos que la prueba justifica las conclusiones de hecho de la Junta y que no erró en su interpretación del artículo 8(1)(*i*) en relación con el 8(2)(*b*), supra.

■ Por último, sostiene el peticionario que la Junta erró al resolver que la Autoridad de Transporte no incurrió en práctica ilícita de trabajo al negarse a emplear al peticionario de nuevo cuando la Asamblea de la Unión lo restituyó como miembro de la Unión. La contención del peticionario es que la Autoridad violó el Convenio Colectivo que tenía con la Unión y al hacerlo incurrió en una práctica ilícita de trabajo bajo el artículo 8(1)(*f*) de la ley que así lo dispone. A este respecto la Junta se expresó en esta forma:

"A virtud del mencionado convenio colectivo la Autoridad debería probar, hasta por 20 días, a todo chófer que le fuera enviado por la Unión. No hay la menor duda que este concepto del convenio vislumbraba casos de empleados cuyos historiales de trabajo no conocía la Autoridad y para cerciorarse de la pericia, responsabilidad, espíritu de servicio, eficiencia y otros factores que entran en la consideración de un nuevo empleado, disponía la Autoridad de 20 días de oportunidad para aceptar o rechazar y en este último caso, pedir nuevos candidatos a la Unión. . . .

---

(⁷)Compárense los comentarios a nuestra Ley en 59 Harv. L. Rev. 976: "*Experience and Experiment in Labor Legislation: Puerto Rico Labor Relations Act*", especialmente a la pág. 980, cuando al referirse al alcance de los artículos 8(2)(*b*) y (8(1)(*i*), se dice:

"Es conveniente la disposición de la Ley de Puerto Rico en cuanto a los problemas de separación, confiriéndole a la Junta autoridad para actuar directamente contra la organización obrera. Tiene la ventaja de poner en manos de una Junta administrativa desinteresada el poder de revisar separaciones de la unión. . . . El enfoque de Puerto Rico no será grato para los obreros, toda vez que confiere a un extraño el poder de regular las prácticas de la unión en cuanto a admisiones se refiere. Sin embargo, las uniones estarán conformes en tanto en cuanto elimina un fundamento por parte del patrono para no cumplir con un convenio de taller cerrado. Por otro lado, *la ley releva al patrono de la obligación de determinar si los requisitos para pertenecer a la unión son razonables o no.*" (Bastardillas nuestras.)

"Sería irrazonable creer que Baudilio Rivera tenía que ser probado por la Autoridad respecto a los factores que hemos señalado cuando ya la Autoridad conocía su récord de trabajo y, sobre todo, cuando el Comité de Quejas y Agravios, compuesto por representantes de la Unión y de la Autoridad en distintas ocasiones lo había juzgado y encontrado culpable de actos y conducta que hablaban desfavorablemente de la calidad de su eficiencia y comportamientos. Teniendo, como tenía la Autoridad ante sí, un historial completo de Baudilio Rivera durante el tiempo que éste sirvió como chófer de la Autoridad, no tenía que permitirle probara su aceptabilidad o ineficiencia. . . . No creemos se trata aquí de una acción unilateral tomada por la Autoridad en menoscabo de los sanos principios de la negociación colectiva. No puede inferirse que sea esto uno de esos actos inspirados en el propósito de alentar o desalentar actividades en favor o en contra de determinada organización obrera, o uno puramente caprichoso. Creemos, más bien, que fué uno dentro del uso razonable de la discreción, y de las prerrogativas administrativas y consistente con el convenio colectivo entre la Autoridad y la Unión. Además, el hecho de haber la Autoridad solicitado de inmediato una nueva terna a la Unión, demuestra su intención de no salirse de los canales del convenio colectivo y es prueba de la buena fe de su actuación rechazando el nombre del primero. No hemos encontrado tampoco, en todo el récord de este caso, propósito o intento alguno, de parte de la Autoridad, de escapar a sus obligaciones contractuales o de intervenir ilegalmente con los derechos reservados a los empleados bajo el artículo 4 de la ley."

No erró a nuestro juicio la Junta al llegar a las anteriores conclusiones y al interpretar el alcance del convenio colectivo. Es un hecho significativo además, que la Unión nunca consideró que la actuación de la Autoridad al rechazar al peticionario constituyera una violación del Convenio Colectivo y se querellara en contra de la Unión ante la Junta de Relaciones del Trabajo. Por el contrario, al ser rechazado el peticionario por la Autoridad le sometió otros nombres. La resolución de la Junta sobre este punto equivalió a reconocer en la Autoridad discreción para aceptar o no un empleado.

*Debe desestimarse la petición en este caso.*

El Juez Asociado Sr. Negrón Fernández se inhibió.