Negrón Soto, Juez Ponente
TEXTO COMPLETO DE LA RESOLUCION
Denegamos la presente solicitud de Certiorari por considerar que no erró el Tribunal de Primera Instancia al desestimar el Recurso de Revisión que le fuera presentado por el Señor Pedro Figueroa Santiago aquí peticionario, en atención a la norma que establece que las decisiones administrativas gozan de una presunción de corrección unido a la ausencia en el expediente ante nos de prueba que conlleve revocar o variar dicha decisión.
I
Los hechos creídos por la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) son los que se señalan a continuación.
El Señor Pedro Figueroa Santiago fue nombrado el 12 de julio de 1993 en el puesto de Oficial Correccional I con status probatorio. El 27 de julio de ese mismo año, el Instituto de Ciencias Forenses realizó en la Academia del Campamento Santiago pruebas de orina a los oficiales de custodia de la Administración de Corrección, pruebas de orina para la detección de sustancias controladas. Ese día, desde las 10:10 a.m. hasta las 4:20 p.m., se tomaron muestras a trescientas cincuenta personas, entre quienes se encontraba el Señor Figueroa. Estas muestras fueron tomadas en los baños del Anfiteatro de la Academia, el cual tenía un baño para damas y uno para varones.
Para tomar dichas muestras, los funcionarios del Instituto le entregaron a los cadetes un vaso, un termómetro y un formulario (relevo de responsabilidad) para que éstos firmaran e iniciaran. Estos también debían proveer su nombre y número de seguro social. Concluido ese trámite, se les indicaba que se dirigieran al baño donde se les tomaba la muestra de orina. En el baño había cuatro inodoros, dos urinales y dos lavamanos. Sin embargo, como entraban de diez a doce cadetes a la vez, a algunos de éstos se les instruyó para que se pararan en el pasillo dentro del baño y allí dieran la muestra. 
El 24 de agosto de 1993, la Dra. Lyvia Alvarez, Directora Ejecutiva del Instituto de Ciencias Forenses, le escribió a la Administración de Corrección notificándole que la prueba del Señor *1242 Figueroa había dado positiva a cocaína. Como consecuencia de dicha comunicación, en septiembre de 1993, la Administración de Corrección le cursó una carta al Señor Figueroa indicándole su intención de destituirlo por haber dado positivo a dicha prueba. El 27 de marzo de 1995, luego de celebrada una vista pública y haber rendido su informe el oficial examinador, el Administrador de Corrección, Señor Joseph Colón, destituyó al Señor Figueroa de su puesto de Oficial de Custodia I, por lo que éste presentó un escrito de apelación ante J.A.S.A.P.
El 19 de diciembre de 1995, la Oficial Examinadora, Marisol Gómez Figueroa, rindió su informe mediante el cual le recomendó a J.A.S.A.P. que declarase ha lugar la apelación, ordenase la reinstalación del apelante a su puesto de Oficial de Custodia con carácter probatorio y le pagasen los haberes dejados de percibir durante el término de enero a marzo de 1995. J.A.S.A.P., en su Resolución, adoptó las determinaciones de hechos de dicha Oficial Examinadora, a excepción de la número 18, la cual indicaba que de la prueba ante ella presentada no surgía que a Figueroa se le hubiese orientado en qué consistía el procedimiento de la toma de la prueba de orina antes o después de haberse realizado ésta ni se le había advertido que podía conservar parte de la muestra, pues del relevo de responsabilidad, orientación e información firmado por éste surgía que había sido orientado y que había optado por no solicitar la parte de la prueba de orina a la que tenía derecho. Además, consignó que el Señor Rodríguez no estaba utilizando medicamentos durante la semana anterior a la prueba, ya que en dicho documento se trazó una raya en el apartado titulado "MEDICAMENTOS USADOS EN LA ULTIMA SEMANA". En atención a esto y contrario a la recomendación de la Oficial Examinadora, J.A.S.A.P. declaró no ha lugar la apelación y sostuvo que "[l]a acción decretada obedece a que el apelante mostró carecer de la habilidad, hábitos o actitudes que se requieren para desempeñarse satisfactoriamente como Oficial de Custodia de la Administración de Corrección."
Figueroa recurrió al Tribunal de Primera Instancia, Sala Superior de Ponce, quien desestimó el recurso de revisión indicando que nada en el récord del caso demostraba que debía apartarse de la norma de guardar deferencia a las decisiones administrativas, las cuales tienen a su favor una presunción de regularidad y corrección. Además, advirtió que el recurso de Revisión presentado ante dicho tribunal no cumplía con las Reglas 5(b) (2) y 5(e) de las Reglas para el Procedimiento de Revisión de Decisiones Administrativas ante el Tribunal Superior. Inconforme con dicha Sentencia, el Señor Figueroa presentó esta petición de Certiorari. Discutiremos los tres errores imputados.
II
El peticionario sostiene, en primer lugar, que erró el Tribunal de Primera Instancia al desestimar el recurso de revisión bajo el fundamento de que no había cumplido con las Reglas 5(b)(2) y 5(e) de las Reglas de Procedimiento de Revisión de Decisiones Administrativas ante el Tribunal Superior. No obstante, debemos señalar que este error no fue cometido, ya que, según se desprende de la Sentencia del 20 de junio de 1996, el Tribunal de Primera Instancia no desestimó el caso por haber el peticionario incumplido con las Reglas 5(b) (2) y 5(e), supra, sino que meramente se limitó a advertir al Señor Figueroa sobre dicho incumplimiento. 
III
Como segundo señalamiento, alega el peticionario que erró el Tribunal de Primera Instancia al concluir que él no había demostrado argumentos razonables que obligasen al Tribunal a apartarse de la norma que le impone a los tribunales el guardar deferencia hacia las determinaciones de hechos de las agencias administrativas y que establece una presunción de corrección en cuanto a las decisiones administrativas, ya que en este caso no había controversia en cuanto a los hechos. No obstante, debemos mencionar que en el caso de autos, aunque el peticionario indicó que no había controversia en cuanto a las determinaciones de hechos, éste solicitó en particular que se guardase "deferencia" hacia las determinaciones de hechos y presunción de corrección que pernean estas determinaciones, a las que llegó la Oficial Examinadora de la Junta que fue quien vio, escuchó y analizó la prueba que ante ella desfiló, las cuales en parte están en contradicción con las determinaciones de hechos a las que llegó J.A.S.A.P.
Luego de esta aclaración, procedemos a considerar este señalamiento de error.
La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, en la see. 3.3, 3 L.P.R.A. sec. 2153, dispone en cuanto a los Oficiales Examinadores que:

*1243
"(t)oda agenda podrá designar ofidales examinadores para presidir los procedimientos de adjudicación que se celebren en ella...

El jefe de la agencia podrá delegar la autoridad de adjudicar a uno o más funcionarios o empleados de su agencia..."

Al llevar a cabo esta función adjudicativa "[pjuede que el examinador o juez administrativo sólo emita una recomendación o informe que sea razonable para el jefe de la agencia o el cuerpo encargado administrativamente de resolver formalmente el asunto en controversia..." D. Fernández, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, Colombia, Ed. Forum, 1993, pág. 198. Dicho informe no es uno concluyente y cuando se impugnan las determinaciones de hechos de la agencia administrativa, éste se considerará como parte del récord de la agencia a revisarse, Rivera v. Junta de Relaciones del Trabajo, 70 D.P.R. 342 (1949), Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 208 (1987).
Las funciones del Oficial Examinador fueron descritas por nuestro más alto foro de la siguiente manera:
"Consiste en celebrar audiencias públicas a las cuales comparecen las partes con sus testigos y, una vez terminada la prueba, rendir un informe detallado a la Junta expresando su recomendación de acuerdo con la audiencia y la ley aplicable. Pero su informe no pasa de ser una mera recomendación que, de acuerdo con la ley que la creó y con su propio reglamento, la Junta tiene discreción para alterar." Rivera v. Junta de Relaciones del Trabajo, supra, págs. 345-346.
Al delegar estas funciones, lo importante es que el jefe de la agencia, quien debe firmar la resolución u orden salvo, que haya otro funcionario autorizado para ello por ley, tome "una decisión informada con conocimiento y comprensión de la evidencia ofrecida sin que importe al caso el medio o mecanismo por el que esa inteligencia de la cuestión debatida llegue a su poder." A.D.C.V.P. v. Tribunal, 101 D.P.R. 875, 883 (1976), Henríquez v. Consejo de Educación Superior, supra, 209. Sin embargo, "cuando el informe del oficial examinador que preside la vista es contrario e incompatible con el del organismo administrativo, particularmente en cuestiones que dependen del contacto inmediato con la prueba, nuestra función revisora es susceptible de tornarse más rigurosa". Henríquez v. Consejo de Educación Superior, supra, págs. 208-209.
En fin, debemos concluir que las agencias administrativas no están obligadas por las determinaciones de hechos de los Oficiales Examinadores y ante una incongruencia entre las determinaciones de hechos del Oficial Examinador y la Resolución de la Agencia se considerará dicho informe como parte del expediente administrativo a examinar, el cual, sin embargo, lo será de una manera más rigurosa.
Por otro lado, en cuanto a la revisión de las determinaciones de hechos de los foros administrativos por los tribunales, nuestro más alto foro estableció que "...los procedimientos y las decisiones ante un organismo administrativo tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que la impugne no produzca suficiente evidencia para derrotarlas. Henríquez v. Consejo de Educación Superior, supra, pág. 210. Además, la Ley de Procedimiento Administrativo Uniforme, see. 4.5, 3 L.P.R.A. sec. 2175, establece que las determinaciones de hechos de las decisiones ¿e las agencias administrativas serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". Facultad v. Consejo, _ D.P.R. _ (1993), 93 J.T.S. 88.
En el caso de autos, la Resolución de la agencia no adoptó la determinación de hechos número 18 del informe del Oficial Examinador, la cual, como anteriormente indicáramos, estableció que de la prueba presentada no se pudo determinar que al peticionario se le hubiese orientado sobre el procedimiento de la toma de la muestra de orina. La Oficial Examinadora llegó a esta conclusión tomando en consideración el testimonio del apelante, quien indicó que los funcionarios del Instituto sólo le indicaron "firma e inicia aquí que son muchos" y un cálculo que ella hizo mediante el cual llegó a la conclusión que el tiempo aproximado por persona para tomar la prueba fue uno de 1.16 *1244 minutos por persona.
No obstante, debemos mencionar que en el caso de autos el peticionario no presentó documento alguno ni transcripción de la prueba que sostenga su señalamiento. Por el contrario, él omitió los únicos documentos relevantes para dirimir tal situación, los cuales disponen que el Sr. Figueroa Santiago dio "positivo corroborado para cocaína", que no solicitó muestra de su donación y que no utilizó medicamentos durante la semana anterior a la toma de la muestra. Estos establecen, también, la temperatura, cantidad, hora y día en que se tomó dicha muestra y la firma, sexo, edad, número de seguro social del Señor Figueroa. El relevo de responsabilidad contiene el siguiente texto:

"Certifico que la información sobre medicamentos suministrada en este formulario es completa y correcta.

La muestra de orina aquí suministrada será utilizada para urinálisis con el único propósito de determinar o excluir la presencia de sustancias controladas conforme a la Orden Ejecutiva del Gobernador de 9 de octubre de 1986. Boletín Administrativo Número 4784, según enmendada.

Tengo derecho y así lo reconozco de solicitar parte de la muestra de orina si excede el mínimo requerido, la cual se me proveerá al momento de obtener la misma. Además quedo aquí informado que para que mi muestra sea apta para análisis tendré que conservarla en el envase original con el sello intacto y mantenerla refrigerada, a partir de las 24 horas después de la donación, la cual podré llevar al laboratorio de mi preferencia. Los gastos incurridos con motivo de esta acción serán sufragados por mí."

Además, surge de los documentos ante nos que el peticionario en ningún momento refutó que la prueba de orina, objeto de este caso, fuese la suya. Por último, debemos señalar que del récord del , caso tampoco surge cuánto tiempo se tardó el señor Figueroa en dar dicha muestra.
Ante esta prueba irrefutable, concluimos que hizo bien J.A.S.A.P. al no aceptar la determinación de hechos número 18 y al determinar, tomando en consideración el relevo de responsabilidad firmado por el señor Figueroa, que éste estuvo "debidamente orientado de los derechos que le asistían". Resolución del 27 de diciembre de 1995 de J.A.S.A.P, pág. 1.
Por lo tanto, en atención a que las decisiones administrativas gozan de una presunción de corrección, que la deferencia administrativa a guardar es para la Resolución de la Agencia Administrativa y no al Informe del Oficial Examinador y que la prueba presentada ante nos sostiene la conclusión de J.A.S.A.P., el error señalado por el peticionario no fue cometido.
IV
Por último, argumenta el peticionario que erró el Tribunal de Primera Instancia al desestimar su recurso de revisión a pesar que éste plantea cuestiones estrictamente de derecho señalando de pasada que se violó el derecho a la intimidad, tanto a él como a sus compañeros.
Si bien es cierto que la Ley de Procedimiento Administrativo Uniforme dispone en la sección 4.5, supra, que las "conclusiones de derecho serán revisables en todos sus aspectos por el tribunal", del expediente ante nos, no surge que al peticionario se le haya violado el derecho a la intimidad y, por lo tanto, debemos concluir que dicho señalamiento de error es improcedente. Veamos.
La Constitución del Estado Libre Asociado de Puerto Rico en su Artículo II dispone, en cuanto al derecho a la intimidad, lo siguiente:

"Sección 1: La dignidad del ser humano es inviolable.

Sección 8: Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar.

Sección 10: No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables..."

*1245 El derecho a la intimidad es "uno de los derechos de la personalidad, de índole innata y privada, inherente al hombre." Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 59 (1986). Este derecho es uno consustancial, a la dignidad, humana y su restricción no se. justifica, salvo, que se demuestren "circunstancias especiales de amenaza real a nuestra seguridad nacional, o un grave peligro para el orden social, o cualquier otro interés apremiante del Estado". Arroyo v. Rattan Specialties, Inc., supra, pág. 61.
En Puerto Rico, nuestro más alto foro no se ha expresado en cuanto a si las pruebas de dopaje ordenadas por el gobierno le violan el derecho a la intimidad a las personas sujetas a ellas sin embargo, el Tribunal Supremo de Estados Unidos, sí lo ha hecho. En Treasury Employees v. Von Raab, 489 U.S. 656 (1989), dicho tribunal estableció que los empleados que utilizan armas de fuego tienen, en cuanto a las pruebas de dopaje, una expectativa de privacidad disminuida y por lo tanto se justifica la restricción de ese derecho. A esos efectos, dijo que:
"We think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Sevice personal information that bears directly on their fitness..." ibid., pág. 672.
En atención a lo antes expuesto, debemos determinar cuáles son las funciones de los oficiales de custodia de la Administración de Corrección. La ley orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974 en su art. 8, 4 L.P.R.A. see. 1126, dispone, en cuanto a las responsabilidades de los oficiales de custodia que:

"Se creará, para formar parte del personal correccional, un cuerpo integrado por oficiales de custodia que tendrá a su cargo la responsabilidad de custodiar los confinados, conservar el orden y la disciplina en las instituciones penales, proteger a la persona y ala propiedad, supervisar y ofrecer orientación social a los confinados y además desempeñar aquellas otras funciones que le asigne el Administrador o el funcionario en quien él delegue. Podrán, además, perseguir a confinados evadidos y liberados contra quienes pesa una orden de arresto emitida por la Junta de Libertad Bajo Palabra y aprenderlos a cualquier hora, y en cualquier lugar; y para ello podrán utilizar los mismos medios autorizados a los agentes del orden público para realizar un arresto."

Las funciones arriba mencionadas denotan la gran responsabilidad que tienen los oficiales de custodia en velar por la seguridad de los confinados y de las personas en la libre comunidad. Estos tienen el deber de conservar el orden y la disciplina en las instituciones penales pudiendo para ello utilizar los mismos medios autorizados para los agentes del orden público. Además, debemos señalar que a dichos oficiales se les asigna un arma como parte de su equipo de trabajo.
Es sabido, que "[e]l mundo del trabajo no está exento de la presencia de la droga... Las consecuencias del uso de las drogas no se contraen exclusivamente a la fase del cumplimiento de las obligaciones por parte de los empleados. Tiene otras implicaciones que pueden ocasionar severas responsabilidades para el patrono o pérdidas económicas." D. Fernández, ibid., pág. 275.
En atención a lo anteriormente expuesto, debemos indicar que de acuerdo con las responsabilidades que le han sido delegadas a los oficiales de custodia por la Ley Núm. 116, supra, éstos tienen una expectativa de privacidad disminuida, por lo que la misma debe ceder ante el interés apremiante de contar con funcionarios que estén libres del uso de drogas, sobre todo si van a ejercer funciones tales como las arriba mencionadas, entre las que se encuentra la utilización de armas de fuego. Por lo tanto, concluimos que al peticionario tampoco se le violó el derecho a la intimidad. 
v
En atención a los fundamentos antes expuestos, se deniega esta petición de Certiorari.
*1246 Así lo acordó el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 97 DTA 90
1. La Oficial Examinadora concluyó que los funcionarios del Instituto de Ciencias Forenses tardaron 1.16 minutos por persona en orientar y tomar cada muestra de orina. Sin embargo, dicha conclusión no fue acogida por J.A.S.A.P. en su Resolución.
2. El Señor Luis Rodríguez Félix, quien fue monitor durante esta prueba, testificó que el procedimiento a seguir al tomar este tipo de pruebas es el siguiente:
(a) el cadete o funcionario pasa por la mesa del Instituto (sic); allí se le entrega una hoja de control con un envase y se le orienta si quieren parte de la muestra de orina,
(b) la persona pasa al baño, donde se supone que sea una persona por cubículo, toma la muestra, que no debe ser menor de 60mm,
(c) luego la muestra se le entrega al recolector quien anota la cantidad y la temperatura de control y el envase. El envase se sella con un sello de seguridad el cual se inicia por el empleado y el monitor. Informe del Oficial Examinador, J.A.S.A.P., pág. 4.
Aunque el Señor Rodríguez no fue quien atendió al Señor Figueroa, éste, tomando en consideración el Acta de Incidencias, indicó que no hubo problema alguno y que se siguió el procedimiento debido al tomársele la prueba de orina al Señor Figueroa.
3. Debemos señalar que el señor Figueroa incumplió con dichas Reglas, ya que la relación de hechos de la solicitud de revisión no fue una breve como dichas reglas exigen, ya que excedió, sin el permiso del tribunal, el máximo de su recurso de revisión de veinte páginas permitido por la Regla 5(e), supra.,
4. A esos efectos en la Sentencia se indica que:
"ATENDIDO EL RECURSO PRESENTADO, ADVERTIMOS QUE EL MISMO NO CUMPLE CON LOS REQUISITOS DE LA REGLA 5(B)(2) Y 5(B) DE LAS REGLAS PARA EL PROCEDIMIENTO DE REVISION DE DECISIONES ADMINISTRATIVAS ANTE EL TRIBUNAL SUPERIOR." ( Enfasis nuestro).
5. 3 L.P.R.A. see. 2164.
6. Esta afirmación fue mencionada en la parte argumentativa y no en las determinaciones de hechos de su informe.
7. Junto a la negación de recibir parte de la muestra de orina aparecen la iniciales del Señor Figueroa las cuales aparecen, también, junto a su firma.
8. Véase, también, Skinnerv. Railway Labor Executives' Assn., 489 U.S. 602 (1989).
9. No obstante, comprendemos la preocupación expresada por la Oficial Examinadora en su informe, el cual señala que no es la primera vez que la apelada comete errores en la administración de muestreo al no seguir el procedimiento consignado en la Orden Ejecutiva del Gobernador de 9 de octubre de 1986, Boletín Administrativo Número 4784, según enmendada, y ante las circunstancias presentes en este caso donde se tomaron 301 pruebas en aproximadamente seis (6) horas. Además, ella consignó que al peticionario y sus compañeros se le violó el derecho a la intimidad, ya que se le requirió que "dieran su muestra en un baño con otras 9 a 12 personas a la vez y donde por lo menos ocho (8) se veían uno al otro donando la muestra." Sobre este último señalamiento, ni de las determinaciones de hechos de la Oficial Examinadora ni del expediente ante nos surge prueba en cuanto a que al peticionario se le haya obligado a orinar en el pasillo del baño donde los otros oficiales lo pudiesen ver, por lo que no se probó que al peticionario se le violara su derecho a la intimidad.
10. Aunque en este caso los Oficiales de Custodia tienen una expectativa de privacidad disminuida, bajo ninguna *1247 circunstancia ello le da licencia a la apelada para llevar a cabo un procedimiento en violación a lo establecido por la reglamentación del Ejecutivo, y a la dignidad del ser humano y en detrimento de su derecho a la proteción de ley contra ataques abusivos a su honra, a su reputación y a su vida, según consignado ¿n las secciones 1, 8 y 10 del Artículo II de nuestra Constitución, supra. Véase Juan B. Soto Sastre v. Administración de Corrección, Sentencia dictada el 30 de noviembre de 1994 por el Tribunal de Apelaciones en el caso KAC-94-0272.