LUCE & COMPANY, S. EN C., peticionaria, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, querellada.

Núm. 8.—*Sometido:* Marzo 7, 1950. *Resuelto:* Mayo 10, 1950.

*Charles R. Hartzell* y *José L. Novas,* abogados de la peticionaria;
*Hon. Procurador General Vicente Géigel Polanco, A. Torres
Braschi, Procurador General Auxiliar* e *Hiram R. Cancio
Vilella,* abogado éste de la Junta de Relaciones del Trabajo,
abogados todos de la querellada.

El Juez Asociado Señor Snyder emitió la opinión del tri-
bunal.

Se trata de una solicitud radicada por Luce & Company,
S. en C. para que revisemos una Decisión y Orden de la
Junta de Relaciones del Trabajo al efecto de que la compañía
incurrió en prácticas ilícitas de trabajo definidas en el ar-
tículo 8(1) (c) de la Ley núm. 130, Leyes de Puerto Rico,
1945 (pág. 407), según fué enmendada por la Ley núm. 6,
Leyes de Puerto Rico, 1946 ((1) pág. 19), conocida como la
Ley de Relaciones del Trabajo. (¹)

La recurrente es miembro de la Asociación de Producto-
res de Azúcar de Puerto Rico. La Asociación celebró un
convenio colectivo con el Sindicato Azucarero de Puerto Rico
(CGT). La unión Local de Trabajadores de la Industria
Azucarera de Santa Isabel, Puerto Rico, que en lo sucesivo
llamaremos la "unión local", está afiliada al Sindicato. El
convenio contenía una cláusula de mantenimiento de matrí-
cula a tenor con la cual los que fueren miembros de la unión
local al celebrarse el convenio y los que ingresaren en lo
sucesivo, deberían mantenerse al día, como condición de em-
pleo, en su *status* de miembros de dicha unión durante la
vigencia del convenio. Esta cláusula también disponía que
previa notificación de la unión de que cualquier empleado no
ha cumplido con sus reglas y reglamentos, la compañía lo
suspendería provisional o permanentemente, según fuere el
caso.

---

(¹) El 30 de noviembre de 1949 dictamos sentencia revocando la Decisión
y Orden. La Junta radicó una moción de reconsideración y la compañía
radicó una contestación a la misma. El 7 de marzo de 1950 la moción de
reconsideración quedó sometida, luego de haber la Junta radicado un me-
morándum de réplica al de la compañía.

Durante los meses de febrero y marzo de 1947 la compañía despidió a siete de sus empleados de conformidad con una solicitud héchale por el Presidente de la unión local para que fuesen despedidos por el fundamento de que no habían pagado sus cuotas a la unión. Poco tiempo después, la Unión de Obreros Independientes de la Industria Azucarera de Puerto Rico, que en adelante llamaremos la "unión independiente", se quejó de estos despidos ante la Junta de Relaciones del Trabajo. Sin embargo, antes de que se radicara una querella formal, el 14 de abril de 1947 la Compañía repuso todos los empleados despedidos, con excepción de uno que no pudo ser encontrado, y de otro que había sido reintegrado a su empleo desde el 10 de marzo de 1947.

No obstante esta actuación de la compañía, la Junta instó el procedimiento fijado por la Ley contra la misma. La Junta oyó el caso y expidió una Decisión y Orden en la que resolvía que al despedir los siete empleados en cuestión la compañía había incurrido en prácticas ilícitas de trabajo según las define el artículo 8(1)(c) de la Ley. Le ordenó a la compañía que desistiera de desalentar en manera alguna la matrícula de la unión independiente y de estimular la matrícula de la unión local mediante despidos discriminatorios. También le ordenó que compensara a los siete empleados despedidos por cualquier pérdida que éstos hubieran sufrido durante las varias semanas que no trabajaron para la compañía. El caso se encuentra ante este Tribunal para revisión de acuerdo con el artículo 9(2)(b) de la Ley.

■■ Antes de entrar en la discusión de los hechos de este caso, es conveniente aclarar dos cuestiones. *Primera*—Bajo la Ley un patrono tiene derecho a despedir a sus empleados por justa causa, o sin causa alguna, incluyendo el mero capricho, siempre y cuando que no sea por motivaciones unionales. *Labor Board* v. *Jones & Laughlin*, 301 U.S. 1, 45. Por consiguiente, en el caso ordinario existe una controversia en los hechos con respecto a si un empleado ha sido despedido por motivaciones unionales. Pero aquí la situación es dife-

rente. La compañía admite que los despidos se debieron a motivaciones unionales. Y tales despidos de ordinario son discriminatorios y violan el artículo 8(1) (c). Sin embargo, la compañía trata de demostrar que ella cae dentro de una excepción a la regla general por el fundamento de que bajo el *Disponiéndose* del artículo 8(1) (c) estos despidos procedían en virtud de una cláusula de seguridad unional.(²) Bajo estas circunstancias, para eliminar la contención de que los despidos eran discriminatorios, la compañía debe demostrar que su conducta encuentra justificación en el *Disponiéndose* del artículo 8(1) (c).

▇▇▇▇ *Segunda.*—En este caso se efectuaron los despidos bajo una cláusula de mantenimiento de matrícula. Por tanto es importante indicar que la responsabilidad de un patrono es mayor bajo tal cláusula que bajo cláusulas de taller cerrado o de taller unionado. Bajo la cláusula de taller cerrado un individuo que solicita empleo tiene que unionarse antes de que pueda dársele empleo y debe permanecer unionado hasta la terminación del contrato. Bajo la cláusula de taller unionado el patrono se reserva el derecho de emplear a cualquier individuo que desee, ya sea o no miembro de la unión, pero los empleados tienen que hacerse miembros de la unión dentro de cierto tiempo y luego permanecer en ella hasta la terminación del contrato. *Phoenixville Publishing Co. and American Newspaper Guild*, 2 L.A. 10 (1946), reimpreso en Shulman y Chamberlain, *Cases on Labor Law*, pág. 1189. Bajo una cláusula de mantenimiento de matrícula un em-

---

(²) El artículo 8(1) (c) dice que constituirá práctica ilícita de trabajo el que un patrono: "Estimule, desaliente o intente estimular o desalentar la matrícula de cualquier organización obrera mediante discriminación al emplear, despedir o en relación con la tenencia de empleo u otros términos o condiciones de empleo, incluyendo un paro patronal; *Disponiéndose,* que nada de lo aquí contenido prohibe a un patrono hacer un convenio de afiliación total o de mantenimiento de matrícula con cualquier organización obrera no establecida, mantenida o ayudada por acción alguna definida en esta Ley como práctica ilícita de trabajo, si dicha organización obrera representa una mayoría de los empleados en una unidad apropiada con facultad para la contratación colectiva."

pleado no tiene que pertenecer a la unión al momento de firmar el contrato, y no se le obliga a entrar en la unión para conservar su empleo. Esta cláusula solamente exige que si un empleado es miembro de la unión en cierta fecha luego de firmarse el convenio o se hace miembro después, debe permanecer en la unión hasta la terminación del contrato. Manoff, *The National War Labor Board and the Maintenance of Membership Clause*, 57 Harv.L.Rev. 183; Freiden, *Some New Discharge Problems Under Union Security Covenants*, 4 Wis.L.Rev. 440, escolio 1.[3]

De la naturaleza de estas cláusulas surge evidentemente el hecho de por qué un patrono puede despedir a un empleado a requerimiento de la unión bajo una cláusula de taller cerrado o taller unionado sin realizar la clase de investigación que debe hacer bajo una cláusula de mantenimiento de matrícula. Bajo las primeras, todos los empleados deben ser miembros de la unión, como condición al empleo. Por tanto, el patrono debe a solicitud de la unión despedir a un empleado que no pertenece a o cesa como miembro de la unión. La Corte Suprema recientemente ha resuelto que esto debe hacerse aun cuando el patrono sepa que el emplado fué expulsado de la unión con motivo de actividades en beneficio de una unión rival. Y la Corte así lo resolvió aun cuando la conducta del empleado ocurrió en un momento cercano a la fecha en que los empleados determinarían de nuevo qué

---

[3] El artículo 2 dispone que cuando se emplean en la Ley: "(7) El término 'convenio de afiliación total' (*all-union agreement*) significará el convenio entre un patrono y el representante de sus empleados en una unidad de negociación colectiva en virtud del cual se requiera de todos los empleados dentro de tal unidad, como condición de empleo, que pertenezcan a una sola organización obrera.

"(8) El término 'convenio de mantenimiento de matrícula' (*maintenance of membership agreement*) significará el convenio entre un patrono y el representante de sus empleados en una unidad de negociación colectiva mediante el cual se requiera, como condición de empleo, de todos los empleados que fueren miembros de la unión a la fecha de la celebración del convenio, o en otras fechas subsiguientes, y bajo tales otras condiciones especificadas en el convenio, mantenerse al día como miembros de la unión durante la vigencia del convenio."

unión deseaban ellos que los representara. *Colgate Co.* v. *Labor Board*, 338 U.S. 355.

Bajo una cláusula de mantenimiento de matrícula existe una situación diferente. Aquí un empleado puede no haber sido nunca miembro de la unión o puede haberse dado de baja antes del otorgamiento del contrato. Por consiguiente el patrono no puede despedir a un empleado por el mero requerimiento de la unión. Debe practicar una investigación razonable para determinar si el empleado envuelto está cubierto por la cláusula de mantenimiento de matrícula. De no hacerla y por el contrario despide al empleado a solicitud de la unión, lo hace a su propio riesgo. Y si en definitiva se demuestra que el empleado no caía dentro de la cláusula, el despido es discriminatorio y viola el artículo 8 (1) (*c*) en vez de caer en la excepción del *Disponiéndose* de dicho artículo. *Idarado Mining Company*, 77 NLRB 392 (1945); *In the Matter of Baker & Company, Inc.*, 68 NLRB 830 (1946). *Cf. In the Matter of Eureka Vacuum Cleaner Company*, 69 NLRB 878, 881 (1946); *Colonie Fibre Co.* v. *National Labor Relations Board*, 163 F.2d 65 (C.C.A. 2, 1947). Cualquier otra regla en efecto permitiría a la unión obligar a empleados que no son miembros a afiliarse a la misma contra sus deseos, infringiendo las expresas disposiciones de la cláusula de mantenimiento de matrícula y en violación de los derechos garantizádosles a los empleados por el artículo 4 de la Ley.[4] Equivaldría a convertir una cláusula de mantenimiento de matrícula en una cláusula de taller cerrado mediante determinación unilateral por parte de la unión.

Con las anteriores consideraciones en mente, examinemos primero el caso de Juan Borrero. La Junta resolvió que él nunca fué miembro de la unión local; que

---

[4] El artículo 4 prescribe como sigue: "Los empleados tienen derecho, entre otros, a organizarse entre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes *por ellos seleccionados;* y dedicarse a actividades concertadas con el propósito de negociar colectivamente u otro fin de ayuda o protección mutua." (Bastardillas nuestras.)

eso no obstante fué despedido por la compañía a solicitud de la unión local; y que al tiempo del despido era miembro de la unión independiente. El caso de este empleado es sencillo. La compañía no practicó investigación alguna para determinar si éste era miembro de la unión local a la fecha en que se otorgó el contrato o si luego se afilió a la misma. Meramente accedió a la petición de la unión local para que se le despidiera. Por tanto no determinó que el despido caía dentro del *Disponiéndose* del artículo 8(1)(c).

La única posible defensa en cuanto a su caso se levanta por primera vez en la réplica de la compañía a la moción de reconsideración radicada por la Junta. En su propia solicitud de revisión ante este Tribunal la compañía alegó que los despidos se realizaron "en cumplimiento de una obligación contractual impuesta por la *cláusula de mantenimiento de matrícula* incluída en el Convenio Colectivo . . . ". (Bastardillas nuestras.) Y hasta donde sabemos asumió la misma posición ante la Junta. Sin embargo, sostiene ahora, oponiéndose a la moción de reconsideración, que el contrato no proveía exclusivamente el mantenimiento de la matrícula. Por el contrario, afirma que éste es un convenio híbrido, con cláusulas de taller cerrado, de taller unionado y de mantenimiento de matrícula, y que en virtud del convenio todos o casi todos los empleados de la compañía tenían que pertenecer a la unión local como requisito de empleo.

En primer lugar, para resolver esta contención bastaría citar el artículo 9(2)(a) de la Ley que provee en parte que "Ninguna objeción que no se hubiera levantado ante la Junta, cualquiera de sus miembros, agente o agencia, se tomará en consideración por la Corte [Suprema], a menos que la omisión o descuido en la presentación de dicha objeción fuere excusada por razón de circunstancias extraordinarias."

Además, diferimos de la compañía con respecto a los méritos de esta contención. Es cierto que el convenio es híbrido y que el inciso (b) de la Sección sobre "Reconocimiento de la Organización Obrera" provee taller unionado para el *nuevo*

*personal.* Por otro lado, se admite que el inciso (*d*), que es el único inciso sobre el cual todas las partes han descansado antes con respecto a este punto, es una cláusula de mantenimiento de matrícula para empleados "actuales y antiguos".(⁵)

La compañía arguye ahora que aquí es de aplicación el inciso (*b*). Sostiene que bajo el inciso (*f*) del convenio "nuevo personal" se define como "todos los trabajadores que nunca han trabajado con el patrono o que habiendo trabajado en la zafra de 1946 o en zafras anteriores a la de 1946, no trabajaron en dicha última zafra hasta terminar la misma..."; que los empleados agrícolas como los que están aquí envueltos, por lo general no trabajan hasta la terminación de la zafra ya que ésta termina el último día de molienda en la central; y que *todos* los empleados no trabajan en el corte y arrimo de caña hasta la terminación de la zafra porque tal trabajo corrientemente va disminuyendo a medida que progresa la molienda. Pero este argumento es muy especulativo. Si la compañía deseaba demostrar que estos empleados específicos que fueron despedidos caían bajo el inciso (*b*) como "nuevo personal" más bien que bajo el inciso (*d*) como "actuales y antiguos trabajadores", debió o pedirle a la unión local alguna evidencia sobre el particular o haber practicado su propia investigación del caso. Este punto nunca fué levantado ante la Junta y no hay en

---

(⁵) El inciso (*b*) reza así: "Es expresamente convenido entre las partes que todo el nuevo personal vendrá obligado a ingresar en el Sindicato y a cumplir con todas las reglas y reglamentos del mismo como condición para mantener su empleo, y si incurriese en faltas de tal cumplimiento, la Unión Local del Sindicato lo notificará al Patrono y será suspendido de su empleo temporal o permanentemente, según sea el caso ..."

El inciso (*d*) provee: "En cuanto a los actuales y antiguos trabajadores empleados por el Patrono dentro de la unidad contratante, aquéllos que sean miembros de la Unión afiliada al Sindicato, o que en el futuro ingresaren en la Unión deberán como condición para mantener su empleo, mantenerse al día ('*good standing*') cumpliendo con todas las reglas y reglamentos del mismo; y si incurrieren en faltas de tal cumplimiento, la Unión Local del Sindicato lo notificará al Patrono y serán suspendidos de sus empleos, temporal o permanentemente, según sea el caso. ..."

los autos evidencia que sostenga la posición de la compañía según ésta se aplica a estos empleados. En verdad la compañía no creyó en este punto cuando ocurrieron los hechos. Como hemos visto, tan pronto como descubrió la situación, inmediatamente repuso a los siete empleados. Desde luego ellos no tenían derecho a la reposición de aplicárseles el inciso (b). Por tanto debemos rechazar esta contención tanto en cuanto a Borrero como en cuanto a los otros seis despedidos. (⁶)

 El próximo problema se refiere a cuatro de los empleados. En cuanto a éstos, la Junta encontró probados los siguientes hechos: "Hicieron su ingreso en la Unión Local en el año 1943, pagando su cuota de iniciación y cotizando de uno a tres meses de cuotas mensuales; pasado este período, dejaron de asistir a las reuniones de dicha Unión; antes del año 1944 comunicaron oralmente a los dirigentes de la misma su intención de desligarse de la Unión Local; ingresaron en la Unión Independiente en los últimos meses del año 1946; fueron despedidos de sus empleos a requeri-

---

(⁶) Tampoco podemos convenir con la contención de la compañía, que aduce por vez primera en su contestación a la moción de reconsideración, al efecto de que el inciso (e) establece "una variante sui generis del taller cerrado." Dicho inciso lee como sigue: "Es expresamente convenido entre las partes que en virtud del certificado de agente contratante exclusivo otorgado al Sindicato por la Hon. Junta de Relaciones del Trabajo de Puerto Rico, y hasta tanto dicho certificado no sea invalidado por ley o por alguna ulterior revocación de dicho organismo, ningún trabajador o grupo de trabajadores podrán demandar ante el Patrono el pertenecer a otras organizaciones obreras, que no sea la contratante, para peticionar otras condiciones distintas a las establecidas en este Convenio, ni podrán dedicarse en horas laborables y en sitios de trabajo a fomentar grupos antagónicos que lesionen la responsabilidad de las partes en el cumplimiento de este Convenio. Disponiéndose, que el Patrono suspenderá del trabajo, a petición de la Unión Local del Sindicato, a cualquier trabajador o grupo de trabajadores por la violación de esta cláusula, probados que fueren dichos cargos ante el Comité de Quejas y Agravios."

. La compañía califica este inciso como "impreciso y hasta confuso". Sin embargo, es innecesario considerarlo ahora, excepto para decir que no puede interpretarse como que deja sin efecto completamente el inciso (d), el cual como hemos visto meramente provee el mantenimiento de matrícula para "actuales y antiguos empleados".

miento de la Unión Local entre febrero y marzo de 1947. ...
Es necesario además señalar que antes del año 1944 el regla-
mento de la Unión Local no contenía disposición alguna fi-
jando los requisitos que debían cumplir sus miembros para
desligarse de su matrícula. Finalmente, el convenio colec-
tivo de mantenimiento de matrícula en el cual se basa la
querellada para sostener la legalidad de los despidos fué fir-
mado el 15 de enero de 1947. Y no hay prueba al efecto de
que los referidos obreros ingresaron en la Unión Local con
posterioridad a esta fecha."

Convenimos con la Junta en que bajo los hechos arriba
reseñados estos cuatro empleados no eran miembros de la
unión local cuando se firmó el convenio y luego no se afiliaron
a la misma. Y concurrimos en el razonamiento de la Junta,
a saber: "Su acción voluntaria de no pagar cuotas, no asistir
a reuniones y *notificar verbalmente su retiro a los dirigentes
de la unión, durante el año 1943* constituye a nuestro juicio
la presentación adecuada de sus renuncias como miembros
de la Unión Local. No concebimos forma más clara de
expresar el deseo de desligarse de una asociación voluntaria
que la utilizada por los mencionados obreros en este caso,
máxime cuando dichos actos fueron realizados en un período
en que no se exigía por el reglamento de la Unión trámite
especial alguno para la presentación de renuncias. Aceptar
la conclusión contraria nos pondría en la posición de decidir
que mientras la Unión Local mantuviese en sus registros los
nombres de los mencionados obreros, habría que considerar
a éstos como miembros de dicha organización no importa sus
deseos repetidamente expresados de desligarse de la Unión
Local y no importa el tiempo transcurrido. Nada, a nues-
tro juicio, sería más atentatorio contra los derechos de los
empleados garantizados por el artículo 4 de la Ley, coartando
su libertad de asociación y obligándolos a permanecer en la
matrícula de la referida Unión." (Bastardillas nuestras.)

Si la compañía hubiese practicado una investigación razonable, interrogando tanto a los empleados envueltos como a los funcionarios de là unión, estos hechos se habrían descubierto. En consecuencia, por los motivos antes expuestos en cuanto a la responsabilidad de un patrono bajo una cláusula de mantenimiento de matrícula, la compañía despidió a estos cuatro empleados a su propio riesgo al despedirlos sin practicar tal investigación. Y al despedirlos a solicitud de la unión local de la cual no eran miembros cuando se firmó el convenio y a la cual no se afiliaron después, la compañía incurrió en prácticas ilícitas de trabajo en violación del artículo 8 (1) (c).

 En cuanto a los dos empleados restantes, a nuestros fines, sus casos eran en un respecto diferentes a los ya considerados: La Junta resolvió que ellos eran miembros de la unión local cuando empezó a regir el Artículo XII del Reglamento de la unión local. Dicho artículo requiere que para que sea válida una renuncia, debe hacerse por escrito y aceptarse por la directiva de la unión local. (7)

La posición de la compañía ante la Junta fué que toda vez que estos dos empleados no sometieron sus renuncias *por escrito* antes de que se firmara el convenio colectivo, los empleados fueron correctamente despedidos a solicitud de la unión local por no estar al día en sus cuotas con ella. La compañía alegó que el Artículo XII contiene dos requisitos independientes, es decir, la renuncia por escrito y la aceptación por la directiva; que aun suponiendo la ilegalidad de la última, la primera estaba en vigor; que estos dos empleados no renunciaron por escrito; que en consecuencia ellos eran miembros de la unión local cuando se firmó el convenio; y

---

(7) El artículo XII, titulado "Disciplina", dice así: "Cualquier miembro de esta Unión que quiera retirarse de la misma deberá hacerlo por escrito, dirigiéndose a la Directiva y cuando dicha Directiva en asamblea extraordinaria aprobare dicho retiro, le pasará una comunicación dándole de baja; mientras así no se lo haga continúa como miembro de esta Unión en todos sus deberes y obligaciones."

que la compañía estaba por tanto justificada en despedirlos a solicitud de la unión local.

Por consiguiente debemos determinar primeramente si el Artículo XII consiste de dos requisitos independientes o si debe considerarse como una sola unidad. Convenimos con la Junta que los dos pasos—el escribirla y el aceptarla—no son independientes. Más bien representan, según resolvió la Junta, un procedimiento único y completo. El escribir la renuncia es meramente el método de iniciar el procedimiento para renunciar que sólo puede completarse mediante la aceptación. Los dos pasos no pueden separarse en cuanto a legalidad, y el Artículo XII es válido o nulo en su totalidad. *Cf. Tugwell, Gobernador* v. *Corte*, 64 D.P.R. 220. (⁷ᵃ)

Pasemos ahora al problema de si el Artículo XII es válido al interpretarse en su totalidad. La Junta resolvió que al así interpretarse el Artículo XII es "arbitrario e irrazonable y constituye una intervención injustificada con los derechos de los empleados garantizados por la Ley." Manifestó que "Sostener la validez de esta disposición equivaldría a colocar en un estado de servidumbre a los miembros de la Unión Local, obligándoles a permanecer en su matrícula hasta que la directiva tuviese a bien aprobar sus renuncias y sometiéndoles a la pérdida de sus empleos como sucedió en este caso al negociar la unión un convenio de mantenimiento de matrícula. No hay duda que, bajo estas circunstancias, el temor a perder el empleo serviría de freno al obrero en el ejercicio de la plena libertad de organización que la Ley le garantiza. La unión tendría un control casi completo sobre la voluntad de sus miembros y sería sumamente difícil para éstos lograr

---

(⁷ᵃ) En virtud de nuestra decisión al efecto de que el Artículo XII consiste de una disposición completa y única, y no de dos partes independientes, no nos detenemos a determinar si un reglamento sería válido si proveyera, sin más, que las renuncias deben someterse por escrito. *Cf. Bendix Aviation Corporation and United Automobile Union*, 15 L.R.R.M. 2650, 52; *American Car & Foundry Co. and Industrial Union of Marine and Shipbuilding Workers of America*, 11 L.R.R.M. 2582, 83; *Progressive Grocers' Ass'n* v. *Golden*, 128 F.2d 318 (C.A., D.C., 1942).

un cambio de afiliación cuando así lo desearen. No creemos que pueda sostenerse este resultado a la luz de la política pública encarnada en la Ley.(⁸) No podemos permitir que sea el arbitrio de los dirigentes de una unión el que decida, en último extremo, el cambio de afiliación de los miembros de esa unión."

La Junta siguió diciendo que si bien la organización interna de una unión atañe particularmente a sus miembros, dicho principio no puede usarse como obstáculo para la ejecución por la Junta de la política pública comprendida en la Ley. Por consiguiente, dijo, "En los casos en que, como en el presente, surja un conflicto entre las normas fijadas por una organización obrera para su gobierno interno y los derechos de los empleados garantizados por la Ley de Relaciones del Trabajo de Puerto Rico, esta Junta no tiene otra alternativa que la de hacer prevalecer los derechos de los empleados."

Convenimos con el razonamiento y el resultado a que llegó la Junta en cuanto a la validez del Artículo XII en su totalidad. Una asociación voluntaria no puede exigir válidamente que será requisito indispensable para retirarse de la misma el que la renuncia sea aceptada. *Haynes* v. *Annandale Golf Club*, 47 P.2d 470 (Calif., 1935) ; *Annotation*, 99 A.L.R. 1441; *Ann. Cases* 1913 C 398; véase *Braddom* v. *Three Point Coal Corporation*, 157 S.W.2d 349 (Ky., 1941). Esta regla se aplica aun con más fuerza cuando, como aquí, los derechos de los empleados a elegir libremente su representante para contratar colectivamente, son específicamente hechos por ley materia de política pública. Y la aplicación de esta política es particularmente apta en un caso donde una unión, antes de firmar un convenio con cláusula

---

(⁸) En este momento la Junta citó en una nota el artículo 1(3) de la Ley que dispone lo siguiente: "A través de la negociación colectiva deberán fijarse los términos y condiciones de empleo. A los fines de tal negociación, patronos y empleados tendrán el derecho de asociarse en organizaciones por ellos mismos escogidas."

de mantenimiento de matrícula, rehusa o no acepta una renuncia y luego, una vez firmado el convenio, solicita el despido del supuesto miembro por no estar al día en sus cuotas. Véase Manoff, supra, pág. 216 *et seq.* Según dijo la Junta, el aprobar tal procedimiento permitiría a la unión obligar a un empleado a permanecer siendo miembro de una unión que no ha obtenido todavía un convenio de mantenimiento de matrícula, en contra de la política pública enunciada en la Ley al efecto de que dicho empleado tiene derecho a retirarse de la unión antes de que se firme dicho convenio. (⁹)

Nos damos cuenta del hecho de que "ésta es una controversia primordialmente entre uniones obreras para obtener el control", y que "En realidad cualquier intervención o discrimen aquí presente no lo causó el patrono, sino compañeros de trabajo de los empleados despedidos." *Colgate Co.* v. *Labor Board*, supra, págs. 364, 363. También reconocemos que nuestra conclusión significa en efecto que la compañía venía obligada no sólo a determinar el contenido del Artículo XII del Reglamento de la unión, sino también determinar que éste era nulo y por lo tanto que la renuncia verbal de estos dos empleados antes de la ejecución del convenio era válida. Pero no podemos escapar de esta regla aparentemente dura si la compañía voluntariamente ha firmado un convenio de mantenimiento de matrícula que hace mandatorio el que ella determine que una solicitud para que se despida un empleado envuelve una persona que era miembro de la unión cuando el contrato se firmó o que se hizo miembro más

(⁹) *Cf. Steele* v. *L. & N. R. Co.*, 323 U.S. 192; *National Labor Relations Bd.* v. *American White Cross Lab.*, 160 F.2d 75 (C.C.A. 2, 1947); *Ford Motor Co. and United Automobile Workers* (Opinión A-74, 1944), Shulman and Chamberlain, supra, pág. 1218; *American Telephone & Telegraph Co., Long Lines Dept., et al.*, id., pág. 1206; *Link-Belt Speeder Corp. et al.*, id., pág. 1252; *Matter of John Wood Mfg. Co.*, Cox, *Cases on Labor Law*, pág. 1224; *Carroll* v. *Local No. 269, etc.*, 31 A.2d 223 (N.J., 1943); *Betts* v. *Easley*, 169 P.2d 831 (Kans., 1946); IV *Restatement, Torts*, Sec. 811, *Comment a*, pág. 169; 59 Yale L.J. 1302; Witmer, *Civil Liberties and the Trade Union*, 50 Yale L.J. 621; 60 Harv.L.Rev. 834; 21 So. Calif.L.Rev. 419; 56 Yale L.J. 731; 14 A.L.R. 1446.

tarde. Al confrontarse durante las conversaciones colectivas con la solicitud de que se incluya tal cláusula, un patrono puede protegerse bastante insistiendo en que en el contrato se incluyan disposiciones expresas para que se identifiquen los miembros de la unión y para que se someta a arbitraje esta clase específica de controversia. Freiden, supra, págs. 441, 451 *et seq.* ([10]) Pero habiendo aceptado la cláusula, el patrono está obligado por ella y se presume que sepa lo que revelaría una investigación razonable en cuanto al *status* de cada empleado.

En manera alguna estamos resolviendo que es el deber de un patrono en cada caso llegar a la conclusión de si determinada regla de una unión es nula. Por el contrario, según indicó la Junta, los asuntos internos de una unión de ordinario atañen exclusivamente a sus miembros. Véanse *Rivera* v. *Junta del Trabajo*, 70 D.P.R. 342, 348, escolio 4; Aaron y Komaroff, *Statutory Regulation of Internal Union Affairs*, 44 Ill.L.Rev. 425, 631. Pero, como dijimos en el caso de *Rivera* a la pág. 355, "pueden surgir situaciones en que el patrono no esté obligado a cumplimentar ciegamente la petición de la Unión, y si lo hace, incurre en una práctica ilícita de trabajo. Especialmente es esto así cuando el patrono tiene o puede tener conocimiento de que la actuación de la Unión no admitiendo o expulsando a un miembro [o no aceptando su renuncia] lo ha sido en violación de los derechos reconocidos a los obreros por la Ley de Relaciones del Trabajo." (Corchetes nuestros.) Y véase 59 Harv.L.Rev. 976, 980. Si bien en una inmensa mayoría de los casos un patrono puede descansar en un reglamento de una unión, éste no puede en un caso que envuelva mantenimiento de

([10]) Como aquí nunca se solicitó el arbitraje, no pasamos sobre la cuestión de si la compañía hubiera tenido derecho bajo la cláusula de arbitraje en este caso, a someter a arbitraje la cuestión del *status* de estos empleados. *Cf. In the Matter of Baker & Company, Inc.,* supra, págs. 831, 840–41 e *In the Matter of Phelps Dodge Copper Products Corporation,* 63 N.L.R.B. 686, 704, 710–11, con *Junta Relaciones del Trabajo* v. *N. Y. & P.R. S/S. Co.,* 69 D.P.R. 782, 803.

matrícula refugiarse en una regla tan palpablemente nula como el Artículo XII. (¹¹)

Es innecesario pasar sobre el fundamento alternativo de la Junta al efecto de que estos dos empleados de cualquier modo no estaban cubiertos por la cláusula de mantenimiento de matrícula, por el fundamento de que ellos no eran miembros al día de la unión a la fecha en que se firmó el contrato, ya que habían dejado de pagar sus cuotas, no habían asistido a las reuniones y habían notificado a los líderes de la unión su deseo de desligarse de la misma. La cuestión que dejamos sin resolver es si los casos citados en apoyo de esta decisión de la Junta son aplicables, en vista del lenguaje un tanto diferente empleado en la cláusula de mantenimiento de matrícula en dichos casos tal cual se compara con la cláusula similar en éste. *Cf. In the Matter of Phelps Dodge Copper Products Corporation,* supra, pág. 710; *In the Matter of Baker & Company, Inc.,* supra, págs. 831, 841.

▬ Resta sólo indicar que el remedio utilizado por la Junta fué el de ordenar a la compañía que desistiera no solamente de alentar la matrícula de la unión local si que también de desalentar la de la unión independiente. A pesar del hecho de que la compañía no tenía conocimiento de la existencia de la unión independiente, esta última disposición era procedente. Es inmaterial que, según manifestó la Junta, "la conducta de la querellada en este caso parece haber sido motivada por un concepto erróneo de sus responsabili-

---

(¹¹) En la página 3 de su opinión disidente el Juez Asociado Sr. Todd sostiene que es a la Junta, y no al patrono, a quien corresponde la facultad de determinar si el Artículo XII es nulo y en su consecuencia si ha habido una práctica ilícita de trabajo. Convenimos en esto. En verdad, eso es exactamente lo que estamos resolviendo en este caso.

En análisis final, fué la Junta, y no el patrono, quien *decidió* en este caso que el Artículo XII era nulo. El patrono sencillamente asumió el riesgo de que ella así lo resolviese. Al despedir los dos empleados envueltos, lo hizo bajo las circunstancias de este caso a su propia responsabilidad y con el riesgo de que la Junta y este Tribunal pudieran resolver que los despidos eran improcedentes. Esto dista mucho del hecho de otorgarle al patrono poder alguno para declarar nulo este artículo en particular. Deja esa función donde pertenece—en la Junta y en este Tribunal.

dades como patrono bajo un convenio de mantenimiento de matrícula, error a que fué inducido por los requerimientos de la unión contratante . . . ". Una compañía que despide ciertos empleados bajo una cláusula de mantenimiento de matrícula, asume todos los riesgos que su actuación conlleva. Si bien la compañía no tuvo esa intención, las consecuencias naturales y lógicas de su conducta ilegal fueron las de desalentar la matrícula de la unión independiente así como alentar la de la unión local. Para remediar la situación, la Junta tenía autoridad para ordenarle a la compañía que desistiera de su conducta que afectaba ambas uniones.

*Nuestra opinión y sentencia de noviembre 30, 1949 serán dejadas sin efecto. La solicitud de la compañía para que se revisen las actuaciones de la Junta será declarada sin lugar y se dictará sentencia poniendo en vigor la Decisión y Orden de la Junta.*

El Juez Asociado Sr. Negrón Fernández se inhibió.

Opinión del Juez Asociado Sr. Todd, Jr. disintiendo en parte.

Concurro con la opinión de la Corte en cuanto trata y resuelve los casos de los primeros cinco empleados.

Disiento en cuanto a los casos de los dos últimos empleados, págs. 13 a 18 de la opinión.

Se dice en la opinión de la Corte:

". . . También reconocemos que nuestra conclusión significa en efecto que la compañía venía obligada no sólo a determinar el contenido del Artículo XII del Reglamento de la unión, sino también determinar que éste era nulo y por lo tanto que la renuncia verbal de estos dos empleados antes de la ejecución del convenio era válida. . . ."

Y a la pág. 18:

". . . Si bien en una inmensa mayoría de los casos un patrono puede descansar en un reglamento de una unión, éste no puede en un caso que envuelva mantenimiento de matrícula refugiarse en una regla tan palpablemente nula como el Artículo XII."

En primer término, no se cita autoridad alguna que sostenga la conclusión de que corresponde al patrono, bajo la

regla de que debe hacer una investigación razonable antes de despedir a un obrero a petición de la unión, en un caso de mantenimiento de matrícula, determinar por sí y ante sí la validez o nulidad de las distintas disposiciones del Reglamento de la unión. Tampoco he podido encontrar ningún caso o autoridad que sostenga tal conclusión.

La regla, según se admite en la opinión de la Corte, es todo lo contrario, es decir, que el patrono no puede intervenir con los asuntos internos de una unión. Menos puede, a mi juicio, proceder por su cuenta a determinar que una disposición del Reglamento de la unión es nula.

El caso de *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 342, y la cita que se hace de la pág. 355 al efecto de que ". . . pueden surgir situaciones en que el patrono no esté obligado a cumplimentar ciegamente la petición de la Unión, y si lo hace, incurre en una práctica ilícita de trabajo. Especialmente es esto así cuando el patrono tiene o puede tener conocimiento de que la actuación de la Unión no admitiendo o expulsando a un miembro lo ha sido en violación de los derechos reconocidos a los obreros por la Ley de Relaciones del Trabajo. . .", no es autoridad para sostener la conclusión de la Corte en el presente caso. Ninguno de los casos citados en apoyo de las frases antes copiadas ([1]) tampoco sostienen dicha conclusión. Una lectura de los mismos demuestra que se refieren a situaciones de hecho e interpretaciones legales completamente distintas a las del caso de autos.

Una cosa es que en determinados casos y situaciones el patrono no esté obligado a cumplimentar, sin investigar antes si procede, la petición de la unión para el despido de un em-

---

([1]) Dichos casos son los siguientes: *Local No. 2880, etc.* v. *National Labor Relations Board*, 158 F.2d 365 (C.C.A. 9, 1946), *certiorari* concedido en 331 U.S. 798 y archivado a moción de la peticionaria en 332 U.S. 845; *Wallace Corp.* v. *Labor Board*, 323 U.S. 248; *National Labor Relations Board* v. *American White Cross Lab.*, 160 F.2d 75 (C.C.A. 2, 1947); *Colonie Fibre Co.* v. *National Labor Relations Board*, 163 F.2d 65 (C.C.A. 2, 1947); *Steele* v. *L. & N. R. Co.*, 323 U.S. 192 y *Tunstall* v. *Brotherhood*, 323 U.S. 210 y Anotaciones relacionadas en 95 A.L.R. 10; 160 A.L.R. 918; 166 A.L.R. 356; 97 A.L.R. 609 y 172 A.L.R. 1351.

pleado, como se resuelve en cuanto a los otros cinco emplea-dos y estoy conforme, y otra es imponer al patrono el deber de asumir el riego de resolver por anticipado si determinada disposición del Reglamento de una unión es válido o nulo—cuando esa facultad corresponde a la Junta de Relaciones del Trabajo al determinar si se ha incurrido o no en una prác-tica ilícita de trabajo, bien por el patrono o por la unión, *Rivera* v. *Junta*, supra.

Conceder esa autoridad a los patronos es colocarlos en una posición que inevitablemente traerá como consecuencia aumentar las fricciones obrero–patronales, que es precisa-mente lo que la Ley de Relaciones del Trabajo quiso evitar. Considero que, de acuerdo con la ley, los patronos no pueden intervenir con los asuntos internos de las uniones y que, en su consecuencia, ellos están justificados en presumir la vali-dez de los reglamentos de las uniones hasta que los mismos sean declarados nulos por la Junta de Relaciones del Trabajo o por las cortes de justicia.

Considero que la regla que se establece en el presente caso no está justificada, ni por ley ni por los precedentes judicia-les, y que además, es innecesaria y contraproducente.

En cuanto a los dos últimos empleados, la Decisión de la Junta debería ser revocada.