RAFAEL RIVERA VALIENTE, peticionario y apelante, *v.* JAIME BENÍTEZ, RECTOR DE LA UNIVERSIDAD DE PUERTO RICO, demandado y apelado.

Núm. 10472.—*Sometido:* Enero 8, 1952. *Resuelto:* Abril 25, 1952.

*Enrique Báez García,* abogado del apelante; *Saldaña, Sánchez & Trías, Sarah Torres Peralta* y *C. Morales, Jr.,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Rafael Rivera Valiente radicó ante el tribunal de distrito una petición de *mandamus* contra Jaime Benítez, Rector de la Universidad de Puerto Rico, para que proceda a reponer a Rivera en su cargo como miembro del personal docente de la Universidad de Puerto Rico. El Rector radicó una moción en que solicitaba en la alternativa la desestimación del recurso o una sentencia sumaria. El tribunal inferior dictó sentencia sumaria a favor del Rector y Rivera apeló de la misma para ante este Tribunal.

El primer señalamiento es que el tribunal de distrito cometió error al resolver que no existía controversia real con respecto a algún hecho esencial y que el recurso debía resolverse a favor del demandado mediante sentencia sumaria como cuestión de derecho. Empezaremos por indicar la naturaleza del caso y el papel que desempeñan las cortes en la controversia.

▬ Durante muchos años Rivera fué profesor de biología en el Colegio de Agricultura y Artes Mecánicas de la Universidad de Puerto Rico. Por consiguiente, su nombramiento era permanente y no podía ser separado del cargo a menos que se le formularan cargos y se le diera la oportunidad de defenderse. Sección 16 de la Ley núm. 135, Leyes de Puerto Rico, 1942 ((1) pág. 763), conocida como "Ley de la Universidad de Puerto Rico". La contención del Rector es que tales cargos y la correspondiente audiencia eran innecesarios toda vez que Rivera había renunciado su cátedra en la Universidad. Cuando el Rector informó a Rivera de esto, éste apeló para ante el Consejo Superior de Enseñanaza, a tenor con la sección 5 de la Ley núm. 135, que prescribe en parte que el Consejo "resolverá las apelaciones que se establecieren contra actuaciones o decisiones del Rector . . .".

El Consejo designó al Lic. Emilio S. Belaval, uno de sus miembros, para que actuara como Examinador. El Lic. Belaval celebró una vista en la cual permitió la presentación de

evidencia documental y oral, la cual fué tomada taquigráficamente. Luego ambas partes radicaron sendos alegatos ante el Examinador en apoyo de sus respectivas posiciones. Después de considerar el récord de la vista así como los alegatos, el Examinador rindió un informe al Consejo conteniendo sus conclusiones de hecho y de derecho al efecto de que Rivera había renunciado y que su renuncia le había sido aceptada. En consecuencia recomendó que se desestimara la apelación.

A Rivera se le envió copia del informe del Examinador. Se le concedieron diez días para que radicara sus objeciones al mismo ante el Consejo. Después de radicadas dichas objeciones, el Consejo resolvió el caso a base del récord de los procedimientos habidos ante el Examinador, el informe de éste y las objeciones de Rivera a dicho informe. En su decisión el Consejo hizo suyas (1) las conclusiones de hecho, (2) las conclusiones de derecho y (3) la recomendación del Examinador de que se confirmara el criterio del Rector al efecto de que Rivera había renunciado.

El papel que desempeñan las cortes en esta controversia es limitado. La Legislatura no proveyó en la sección 5 que las cortes revisarían las decisiones del Consejo. Por otro lado, tampoco prescribió que las decisiones del Consejo serían finales y obligatorias. Durante la vista del caso ante este Tribunal, el abogado del Rector admitió, y convenimos con él, que bajo estas circunstancias la Legislatura no tuvo por miras impedir toda revisión judicial *en un caso que trate de la permanencia y status de un profesor de la Universidad.* Cf. *Núñez v. Benítez, Rector,* 65 D.P.R. 864; Davis, *Administrative Law,* pág. 812 *et seq.*[1] Pero no encontramos base alguna

---

[1] Toda vez que el Rector admite que el apelante tiene derecho a una revisión judicial de la decisión del Consejo en este caso, no hemos considerado la posibilidad de que otras clases de decisiones del Consejo puedan caer en la categoría de actuación ejecutiva más bien que cuasi judicial, contra la primera de las cuales no se concede revisión judicial. El argumento sería que bajo esas circunstancias, la Junta estaría funcionando como fun-

para resolver que tal revisión judicial deba consistir de un juicio *de novo*. Por el contrario, este último método se usa para revisar la actuación de una agencia administrativa solamente cuando el estatuto expresamente así lo provee. *In re Ortiz* v. *Venegas, Alcalde*, 43 D.P.R. 390; *Coll* v. *Todd, Alcalde*, 35 D.P.R. 625; *Marín et al.* v. *Pagán*, 52 D.P.R. 966 (*per curiam*); Davis, supra, pág. 425 *et seq.* En ausencia de tal disposición estatutaria, las cortes no celebran un juicio *de novo*. Más bien se limitan a examinar el récord de los procedimientos habidos ante la agencia administrativa, siempre y cuando exista como en este caso un récord completo de tales procedimientos. Y cuando, como ocurre aquí, también el estatuto guarda silencio con respecto al alcance de la revisión, las cortes sólo determinan si el cuerpo administrativo cometió error sobre cuestiones de derecho. Sin embargo, una de las cuestiones de derecho es si el récord administrativo contiene evidencia sustancial para basar las conclusiones de hecho del cuerpo administrativo. *Ledesma* v. *Tribunal de Distrito*, resuelto en el día de hoy (pág. —); *Castro* v. *Tesorero*, 34 D.P.R. 199; *Coll* v. *Todd, Alcalde*, supra; *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 342; *Buscaglia, Tes.* v. *Tribl. Contribuciones, y Giusti, Int.*, 70 D.P.R. 846; *Ruiz* v. *Comisión Industrial*, 60 D.P.R. 228; *Universal Camera Corp.* v. *Labor Board*, 340 U. S. 474; *New York* v. *United States*, 331 U. S. 284, 334–35; *Kessler* v. *Strecker*, 307 U. S. 22; *Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177; *Securities Comm'n* v. *Chenery Corp.*, 332 U. S. 194; Davis, supra, pág. 868 *et seq.*; Stern, *Review of Findings of Administrators, Judges and Juries: A Comparative Analysis*, 58 Harv. L. Rev. 70; Stason,

ciona una Junta de Directores de una corporación que supervisa y aprueba el trabajo del funcionario ejecutivo de tal corporación, y no como cuerpo cuasi judicial. *Cf. Godreau & Co.* v. *Com. Servicio Público*, 71 D.P.R. 649.

Añadimos que la revisión judicial implícita no existe automáticamente para la revisión de las decisiones de todas las agencias administrativas. Cada caso debe determinarse por sus propios méritos a base de la intención de la Legislatura.

*"Substantial Evidence" in Administrative Law*, 89 U. Pa. L. Rev. 1026. ([2])

Es obvio de lo antes expuesto por qué no podemos convenir con la contención de Rivera de que el tribunal de distrito debió celebrar un juicio *de novo*.   El apelante levantó ante el Examinador un argumento adicional algo inconsistente, al efecto de que el Consejo debió haber resuelto su apelación únicamente a base del récord ante el Rector y que el Consejo, por tanto, estaba impedido bien de admitir evidencia adicional o bien de celebrar un juicio *de novo*.   No nos detendremos a determinar hasta qué punto procedería ese argumento, si se hubieran presentado cargos formalmente y el Rector hubiera celebrado una vista.   Como hemos visto, nunca hubo ningún procedimiento ante el Rector, quien sencillamente asumió la posición de que Rivera había renunciado.   El Rector admite que a tenor con la sección 5 de la Ley núm. 135 Rivera tiene derecho a que el Consejo revise esta "decisión" del Rector. Pero como nunca se celebró vista alguna ante el Rector, el procedimiento celebrado ante el Examinador a nombre del Consejo necesariamente fué la primera vista del caso.   Por tanto es obvio que bajo las circunstancias concurrentes, ambas partes estaban en libertad de presentar ante el Examinador toda la evidencia relevante que apoyara sus respectivas posiciones, pero el caso ante el tribunal de distrito debe determinarse a base del récord ante el Consejo. ([3])

▉▉▉▉ Con los anteriores hechos en mente, pasemos ahora a relatar el procedimiento habido ante el tribunal de distrito. En apoyo de su moción, el Rector radicó una declaración ju-

---

([2]) El hecho de que Rivera titule su recurso como petición de mandamus no afecta esencialmente este caso.  Lo consideramos como una petición de revisión según se provee implícitamente en la sección 5 de la Ley núm. 135. Véase *Núñez v. Benítez, Rector*, 65 D.P.R. 864.

([3]) Si bien no hace gran hincapié en este punto, Rivera alega que el Consejo carecía de autoridad para delegar en un Examinador la función de celebrar la vista.  No estamos conformes.  La Ley núm. 135 no contiene disposición específica en contrario.  Y en vista de la naturaleza de los deberes de la Junta y tal como ésta está compuesta, creemos que procedía que nombrara un Examinador para este fin.  Davis, supra, pág. 396.

rada suya describiendo los procedimientos celebrados ante el Examinador y el Consejo y acompañando entre otras cosas (1) la transcripción taquigráfica de la evidencia presentada ante el Examinador, (2) el informe de éste, (3) la resolución del Consejo confirmando la actuación del Rector, y (4) una declaración jurada del Secretario Permanente del Consejo certificando los documentos adheridos a la declaración jurada del Rector como copias fieles y exactas de los procedimientos habidos ante el Consejo.

El único documento presentado en oposición a la moción del Rector sobre sentencia sumaria fué una declaración jurada de Rivera que decía así: "Que desde el año 1926 hasta diciembre de 1948 desempeñé el cargo de Catedrático de Biología en el Colegio de Agricultura y Artes Mecánicas de Mayagüez, con excepción del último año en que, con permiso expreso del Rector, me dediqué a la preparación de un texto de Biología; que nunca he presentado la renuncia de mi cargo como tal Catedrático sino que, por el contrario, siempre he deseado continuar al frente de la Cátedra que desempeñé por más de veinte años; que he leído las actas de la Junta Universitaria de Mayagüez y especialmente la correspondiente a la reunión del día 4 de marzo de 1947 y no es cierto el total contenido de dichas actas, especialmente lo que se refiere a que se me concedió una licencia; que nunca me han formulado cargos y que me encuentro privado de mi Cátedra por una decisión arbitraria e injusta del Rector de la Universidad de Puerto Rico."

Conviene describir en este momento las partes pertinentes de alguna de la evidencia documental hallada en el récord de la audiencia ante el Examinador. Las actas de la reunión de la Junta Universitaria de Mayagüez del día 8 de febrero de 1947, en la cual Rivera estuvo presente como Representante del Claustro, demuestran que luego de un desacuerdo en cuanto al nombramiento de un instructor, Rivera renunció allí mismo como Director Interino del Departamento de Biología y por primera vez propuso que renunciaría como profesor si se le

concedía licencia por el resto del año y el próximo con el fin de terminar su libro. (4)    De los autos ante el Examinador también aparece una carta del 15 de febrero de 1947, dirigida por Rivera al Secretario-Registrador de la Junta Universitaria de Mayagüez, en la cual insiste en su proposición oral en la reunión del 8 de febrero de 1947 al efecto de que es su intención renunciar su cátedra si se le concede licencia para terminar su libro.    La carta, que de su faz indica que se envió a través del Director Interino del Departamento de Biología, del Decano Interino de Ciencias y del Vicerrector, dice así:

"Tengo el gusto de solicitar de ustedes una licencia extraordinaria de 15 meses con sueldo completo comenzando el 30 de junio de 1947.    Es mi propósito dedicar todo ese tiempo a la terminación de un libro de texto que sobre Botánica General estoy escribiendo.    Creo que esta obra será de gran beneficio para este Colegio y para la Universidad de Puerto Rico.    *Al expirar esta licencia renunciaré mi cargo en este Colegio para dedicarme al ejercicio privado de mi profesión.*    Me anticipo a solicitar esta licencia para que ustedes tengan el tiempo necesario para escoger mi substituto en mi cátedra en este Colegio.    Espero me concedan esta licencia y quedo de ustedes . . ."    (Subrayado nuestro.)

El 19 de febrero de 1947 el Director Interino del Departamento de Biología escribió al Decano Interino de la Facultad de Ciencias al efecto de que la carta de Rivera del 15 de febrero de 1947 había sido referida a él para consideración y acción

---

(4) Las actas leen en parte así:

"Sr. Rector: Yo recomiendo que se nombre al Sr. Rivero en calidad de Instructor.

"Sr. Méndez: ¿Cómo queda el asunto?

"Sr. Rector: Yo estoy sometiendo el caso a la Junta.

"Sr. Méndez: Yo pido a la Junta que haga la recomendación.

"Dr. Wiewall: Secundo la moción.    El resultado de la votación fué el siguiente: tres votos a favor; uno en contra y tres abstenidos.

"Prof. Rivera Valiente: Voto en contra.

"Sr. Rector: Aprobado el nombramiento.

"Prof. Rivera Valiente: Voto en contra de la recomendación del nombramiento del Sr. Juan Rivero por considerar que el Sr. Rivero está incapacitado debido a su inexperiencia como maestro para desempeñar la vacante habida en el Departamento de Biología por la renuncia del Instructor, Sr. Mario Pérez Escolar.    Yo voy a pedirle al Decano Interino de Ciencias que

pertinente, y que "No existe objeción alguna de mi parte a que la referida licencia le sea concedida al Prof. Rivera Valiente, ya que considero la misma justa y razonable. Por tal motivo recomiendo muy favorablemente su solicitud con la única condición de que la licencia sea sólo por el año académico, o sea por 12 meses."

En la próxima reunión de la Junta Universitaria de Mayagüez, el 4 de marzo de 1947, Rivera indicó a la Junta que él tenía ya un candidato que lo podía sustituir. Entonces el Rector replicó que "el trámite correspondiente es la recomendación del Jefe del Departamento y del Decano y Vicerrector y discusión posterior en la Junta". Rivera manifestó entonces que "Simplemente el interés que yo tengo es porque por cualquier causa en septiembre no digan que no hay un sustituto, cuando lo hay." El Dr. Wiewall, Decano Interino de la Facultad de Ciencias, dijo entonces que él había discutido el asunto con el Director Interino del Departamento, que éste estaba haciendo gestiones para buscar el sustituto de Rivera, y que la recomendación se haría de acuerdo con las normas establecidas. El Rector leyó entonces en alta voz la solicitud contenida en la carta de Rivera de fecha 15 de febrero de 1947

---

pida al Sr. Rector que acepte mi renuncia con carácter irrevocable como Director Interino del Departamento de Biología.

"Dr. Wiewall: Las renuncias se presentan por escrito al Rector por conducto del Decano.

"Prof. Rivera Valiente: Yo presenté mi renuncia con carácter irrevocable como Director Interino del Departamento de Biología.

"Sr. Rector: Se acepta.

"Prof. Rivera Valiente: Además voy a pedir lo siguiente: Yo estoy escribiendo un libro y tengo que tomar fotografías y dibujos para terminar mi trabajo dentro de año y medio o sea durante el segundo semestre y todo el año escolar 1947–48. Solicito se me conceda una licencia extraordinaria con sueldo para terminar esta labor que creo prestigiaría no solamente al Departamento de Biología de este Colegio sino al Colegio de Agricultura porque éste es el producto de mis conocimientos y experiencia durante veinte años.

"Sr. Rector: Quiero aclarar todo esto. Yo he explicado todos los puntos de vista. Todas estas circunstancias no deben pesar en su ánimo en este sentido. No parece buena administración el que una persona al no prevalecer su criterio, se retire, máxime cuando se trata de una estructura dentro de la cual hay una serie de otras personas con responsabilidad tam-

y las recomendaciones sobre la misma del Director Interino del Departamento y del Decano Interino de Ciencias. Rivera manifestó entonces que "Acepto las recomendaciones, pero que empiece mi licencia en septiembre 1ro. porque tengo derecho a tres meses de vacaciones." De los autos surge que ocurrió entonces lo siguiente:

"Sr. Rector: Lo que pasa es que los presupuestos aquí se hacen de año a año y es bastante dudoso que esta Junta pueda conceder una licencia de septiembre a septiembre. Puede concederla de junio a junio y puede concederla de septiembre a junio, pero no puede concederla por acción que trascienda el marco fiscal del presupuesto con relación al cual está operando.

"Prof. Rivera Valiente: Si es legal sí, porque yo no reconozco a ellos suficiente capacidad en Ciencias Biológicas; carecen de los conocimientos para determinar si en un año se puede escribir un libro. Si pedí una licencia de 15 meses fué con el objeto de terminarlo, porque creo que ése es el tiempo necesario para yo terminar esa obra. Si es un caso legal yo lo acepto. *Yo renunciaré al terminar esa licencia.*

"Sr. Rector: Volviendo ahora a esta solicitud de licencia extraordinaria del Profesor Rivera Valiente, encuentro en primer término la solicitud como está originalmente aquí planteada la Junta sólo puede actuar sobre una proyección tentativa. La principal licencia que vamos a considerar tiene efecto de

bién y con funciones que supone el que fuesen a intervenir asuntos de esta naturaleza y quiero decir al Sr. Rivera Valiente que las Instituciones con una estructura especial como ésta no deben estar colocadas en una situación dentro de la cual una discrepancia de criterio de funcionarios y sobre los cuales legítimamente cabe discrepancia de criterios, que esa persona se retire de los servicios que está llevando a cabo con el beneplácito y el aprecio de las personas que tienen otras responsabilidades y en consecuencia quiero decir que invito al Sr. Rafael Rivera Valiente a retirar su renuncia y que ciertamente no considere la misma como una de carácter irrevocable. Dije que la aceptaba porque eso consecuentemente sigue a este tipo de renuncia, pero aquí en presencia de todos ustedes insisto con el Sr. Rivera Valiente en que deponga esa actitud y que continúe en el desempeño de sus labores.

"Prof. Rivera Valiente: Yo solamente la retiraría si usted retira el nombramiento del Sr. Rivero.

"Decano Ovidio García Molinari: Yo creo que el Sr. Rivera Valiente debe deponer su actitud.

"Prof. Rivera Valiente: Usted puede llamar a los hombres que yo he dicho que son el Profesor Lorenzo García Hernández y el Decano de Agricultura. Ustedes me podrían dar una licencia por el resto de este año y el

julio 1ro. a junio 30. Entiendo que es el deseo del Prof. Rivera Valiente que a la mayor brevedad posible se le releve de sus tareas docentes, claro que como hemos dicho en otras ocasiones, el deseo del profesor está subordinado a la conveniencia docente de la Institución y a las dificultades inherentes a una situación dentro de la cual está el año académico en proceso de desenvolvimiento. Creo que si fuera factible, sin circunstancial perjuicio del estudiantado del Colegio, acceder a los deseos del Prof. Rivera Valiente y relevarle de sus responsabilidades en la cátedra, podría hacerse y no habría ninguna oposición. Esto, sin embargo, está sujeto a información que en estos momentos no tiene ante sí la Junta Universitaria y que en consecuencia no podría actuar sobre eso de inmediato. Me parece tal vez que se armonice adecuadamente la situación si se acepta en principio la solicitud del Prof. Rivera Valiente y la recomendación de que se le conceda un año completo de licencia con sueldo y que ésta sea efectiva a más tardar en julio 1ro. y si se pueden hacer arreglos antes para facilitar esta licencia, que se traigan ante la Junta los posibles candidatos.

"Prof. Rivera Valiente: Yo voy a pedir al Decano de Ciencias que si puede venir inmediatamente el candidato, me haría un gran favor, y yo me dedicaría a la terminación de mi obra.

---

próximo para terminar mi libro y al terminar ese año me retiraría.

"Sr. Rector: Estas dos son cosas distintas.

"Prof. Rivera Valiente: Yo estuve siempre en desacuerdo con Toro en cuanto a la unión del Departamento de Botánica con el de Zoología.

"Sr. Rector: Quiero aclarar una vez más que me reitero a que reconsidere eso y que las renuncias irrevocables no hay otra alternativa que la de aceptarlas, ahora en lo que respecta a este asunto de licencia del Sr. Rivera Valiente al igual que los demás miembros de este Colegio, vería con gran dolor que él fuese a retirarse del Colegio. Me parece razonable que se estudie la posibilidad de permitir al Profesor Rivera Valiente el año próximo que se dedique total o parcialmente a hacer la labor ésta de preparación de su texto y estoy seguro que sería de gran provecho a las personas dedicadas a esa materia. Esto no debe motivar que el Sr. Rivera Valiente prive de sus servicios a esta institución al solicitar una licencia con sueldo para tener efecto inmediatamente, lo cual me parece que está enteramente fuera de lo normal.

"Prof. Rivera Valiente: Yo estoy dispuesto a condicionarla a que se encuentre un sucesor. No es por ese nombramiento que yo he pedido esto, yo le había dicho a Don Luis que yo pensaba retirarme, yo quiero ahora que estoy joven estabilizarme, no quiero llegar a viejo y tener solamente una pensión."

"Sr. Vicerrector: La cuestión ésta para subsistir el cargo del señor Rivera Valiente es cosa que tiene que venir a la Junta y estudiarse.

"Prof. Rivera Valiente: Ya ellos tienen el candidato.

"Decano de Agricultura: Al Colegio de Agricultura le interesa saber quién es el candidato.

"Sr. Rector: Que lo traigan a la Junta para ser considerado. Si posible que presenten más de un candidato.

"Dr. Wiewall: Tengo entendido que hay más de un candidato, cuyos servicios podrían contratarse, pero no sé seguro de alguno que pudiese venir inmediatamente.

"Sr. Rector: Yo dudo que se pueda hacer este cambio ahora. La licencia será de junio a junio, sujeta a ser trasladada hacia adelante en el supuesto de que se puedan hacer arreglos. Una licencia por un año fiscal que tendría vigencia en cualquier caso en julio 1 de 1947. (Se le concede la licencia.)" (Bastardillas nuestras.)

Como más arriba aparece en detalle, en abril de 1947 Rivera fué suspendido en relación con ciertos cargos que se le formularon. Sin embargo, estos cargos se archivaron en noviembre de 1947 y no hay controversia alguna de que Rivera fué entonces relevado de sus deberes como profesor, fué adscrito a la Estación Experimental Agrícola y se le permitió disfrutar su licencia extraordinaria con paga mientras trabajó en su libro. Cuando el Rector le notificó a Rivera que sus relaciones con la Universidad cesaron el 31 de diciembre de 1948, éste apeló de la "decisión" del Rector ante el Consejo, el cual, como hemos visto, estuvo de acuerdo con el Rector.

Ahora estamos en condiciones de discutir el primer señalamiento de error. Examinaremos primeramente la contención de Rivera de que los documentos presentados en apoyo de la moción de sentencia sumaria ante el tribunal de distrito no hubieran sido admisibles en evidencia en el juicio y por consiguiente no debieron haber sido considerados por el tribunal inferior al resolver la moción. ([4a])

([4a]) Ninguna de las partes sostiene que las Reglas, incluyendo la núm. 56 relativa a sentencias sumarias, no se aplican a una solicitud sobre revisión judicial de una decisión de esta clase dada por el Consejo, revisión que hemos resuelto existe por implicación a tenor con la sección 5 de la Ley núm.

Es cierto que estos documentos no podían ser considerados en relación con la moción de sentencia sumaria a menos que fueran admisibles en evidencia. *Hettinger & Co.* v. *Tribunal de Distrito*, 69 D.P.R. 137. Pero no podemos convenir con Rivera en que hubieran sido inadmisibles en el juicio. Como ya se ha indicado, en vista del silencio de la sección 5 de la Ley núm. 135 en cuanto a la revisión por las cortes de las decisiones del Consejo y del método y alcance de la misma, la misión del tribunal de distrito no era celebrar un juicio *de novo*. Más bien el tribunal inferior venía obligado sencillamente a examinar el récord del procedimiento administrativo para determinar si se cometieron errores de derecho, incluyendo la cuestión de si los autos contenían evidencia sustancial para basar la decisión administrativa. Los autos del procedimiento administrativo eran en consecuencia no solamente admisibles en evidencia, sino que constituían la única evidencia que el tribunal inferior podía considerar. Indudablemente, debido al silencio de la sección 5 en cuanto al procedimiento a ser utilizado para elevar el récord administrativo al tribunal de distrito, el demandado pudo haber contestado y esperado hasta el juicio para presentar el récord. *Ortiz* v. *Venegas*, supra. Pero uno de los propósitos de la Regla 56 de las de Enjuiciamiento Civil es precisamente evitar un juicio cuando no existe una controversia real en cuanto a algún hecho esencial. Por tanto, en ausencia de una fórmula estatutaria mediante la cual el récord sea elevado debidamente al tribunal de distrito en el curso ordinario, la Regla 56(*e*) permitía al Rector adherir a su declaración jurada una copia debidamente certificada del récord administrativo en apoyo de su moción de sentencia sumaria. *Farm Bureau Mut. Ins. Co.* v. *Hammer*, 83 F. Supp. 383 (D. Ct., W. Va., 1949); *Bonds* v. *Sherburne Mercantile Co.*, 169 F. 2d 433 (C. A. 9, 1948);

---

135. Bajo esas circunstancias suponemos, sin decidirlo, que las Reglas son aplicables al presente caso. Hacemos constar que fueren o no éstas aplicables, el alcance de la revisión es el mismo: se limita a un examen del récord administrativo para determinar si se cometió algún error de derecho.

*United States* v. *Sinclair Refining Co.*, 126 F. 2d 827 (C. A. 10, 1942) ; véase *Commercial Casualty Ins.* v. *Corte*, 71 D.P.R. 899. (⁵)

▮▮▮ Al afirmar que el récord administrativo sería inadmisible en él juicio, Rivera se queja de que (1) el récord no fué aprobado por ningún funcionario, (2) que el taquígrafo que lo certifica no prestó juramento, y (3) que fué preparado sin la intervención del apelante. Pero Rivera debió haber levantado la segunda cuestión ante el Examinador. Y debió haber levantado las cuestiones primera y tercera ante el tribunal inferior en su oposición a la moción de sentencia sumaria. No podemos considerar errores de esta naturaleza cuando son levantados por primera vez en apelación ante este Tribunal. *Asamblea Municipal* v. *González, Alcalde*, 55 D.P.R. 542, 561–62; *Atiles, Admor.* v. *Com. Industrial*, 69 D.P.R. 871. Todos los documentos, incluyendo el récord administrativo, adheridos a la declaración jurada del Rector, fueron certificados por el Secretario Permanente del Consejo, quien tiene la custodia legal de los mismos. Si Rivera hubiera estado interesado en impugnar la autenticidad del récord, el momento y el sitio para hacerlo era en su moción de oposición a la sentencia sumaria. Excepto en su propia declaración jurada, la cual como más adelante veremos era inadecuada en cuanto a este punto, Rivera no tomó acción alguna que levantara cualquier controversia en cuanto a la autenticidad del récord. Su tentativa de hacerlo por primera vez ante este Tribunal es muy tardía.

El apelante sostiene que impugnó la autenticidad de las actas de los procedimientos ante la Junta Universitaria de Mayagüez en su declaración jurada que acompañó su oposición a la moción de sentencia sumaria. Como hemos visto, su de-

---

(⁵)Indicamos de paso que toda vez que las cortes al decidir las cuestiones aquí envueltas vienen obligadas a ceñirse a los autos del procedimiento administrativo, cualquier otra prueba que surja de las declaraciones juradas que tenga por miras complementar dichos autos, debe ser ignorada. El caso debe ganarse o perderse únicamente a base de los autos, los cuales hablan por sí mismos.

claración jurada de oposición decía en parte, "que he leído las actas de la Junta Universitaria de Mayagüez y especialmente la correspondiente a la reunión del día 4 de marzo de 1947 y no es cierto el total contenido de dichas actas, especialmente lo que se refiere a que se me concedió una licencia . . ."

Sin embargo, la transcripción taquigráfica de la vista ante el Lic. Belaval demuestra que las actas a que Rivera se refirió fueron admitidas en evidencia sin objeción alguna de su parte. En verdad, su propio abogado durante la vista ofreció estipular su autenticidad. Posteriormente, el Examinador en su informe citó verbatim las partes pertinentes de las actas; no obstante, en sus objeciones al informe Rivera no cuestiona estas citas. Finalmente, las actas formaban parte de la transcripción taquigráfica de la vista, la autenticidad de la cual tampoco fué impugnada por Rivera en su declaración jurada en oposición. En vista de estas consideraciones, la declaración jurada de oposición significa a lo sumo que Rivera simplemente reiteraba su posición de que él no había renunciado su cargo y no fué un esfuerzo para impugnar la autenticidad de las actas de las reuniones.

Además, aun cuando fuéramos a resolver que Rivera tuvo en mente atacar la autenticidad de las actas en su declaración jurada de oposición, no dió cumplimiento a los requisitos de la Regla 56(e). Éste y otros tribunales han resuelto que la mera exposición de una conclusión general en una declaración jurada de oposición no es suficiente para suscitar una genuina controversia de hecho. Más bien las declaraciones juradas en oposición deben indicar los hechos pertinentes en detalle con el fin de evitar se conceda un remedio mediante sentencia sumaria. *Hettinger & Co.* v. *Tribunal de Distrito*, supra, págs. 143–44; *Engl* v. *Aetna Life Ins. Co.*, 139 F. 2d 469 (C. A. 2, 1943); *Piantadosi* v. *Lowe's Inc.*, 137 F. 2d 534 (C. A. 9, 1943); *Ortiz* v. *National Liberty Ins. Co. of America*, 75 F. Supp. 550 (D. Ct., P. R., 1948). La declaración jurada en oposición de Rivera obviamente no cumple

con esta norma. La mera manifestación general de que "el total contenido" de las actas de las reuniones de la Junta Universitaria de Mayagüez "no es cierto . . . especialmente lo que se refiere a que se me concedió una licencia . . . " no constituye una manifestación detallada demostrativa de qué manera las actas debidamente certificadas son específicamente erróneas. Resolver lo contrario equivaldría a permitirle a una parte que, con un mero ataque general a la autenticidad de un documento escrito, sin impugnación específica o detallada del mismo, derrote una moción de sentencia sumária. No podemos dar nuestra aprobación a tal adulteración del lenguaje y propósito de la Regla 56.

Pasando a los méritos de la moción de sentencia sumaria, resta la cuestión de derecho de si el récord ante el Consejo contiene evidencia sustancial para basar su decisión de que Rivera había renunciado su cargo. Dejemos a un lado la prueba oral que desfiló ante el Examinador en cuanto a varias conversaciones habidas entre Rivera y el Rector en las que había otras personas presentes. Aun sin esta prueba, hubo evidencia sustancial—las actas de las reuniones de la Junta Universitaria de Mayagüez del 8 de febrero de 1947 y 4 de marzo de 1947 y la carta de Rivera del 15 de febrero de 1947—para apoyar la conclusión del Consejo de que Rivera había de hecho renunciado, a tener efecto al expirar la licencia extraordinaria concedídale con el fin de que pudiera terminar su libro. La concesión de la licencia claramente estaba predicada en la premisa de que su renuncia tendría efecto a su vencimiento. Después de disfrutar de una sustancial licencia con paga, Rivera ahora desea, recurriendo a pirotecnia gramatical, repudiar la renuncia que fué la condición *sine qua non* por la cual se le concedió dicha licencia. En un esfuerzo por comer a dos carrillos, Rivera descansa en el hecho de que su carta del 15 de febrero de 1947 está redactada en tiempo futuro. Pero a la luz de los hechos que rodean esta carta—incluyendo los esfuerzos para seleccionar su sustituto, en los

cuales Rivera intervino—permitir que impere tal *tour de force* semántico, equivaldría en verdad a "construir una fortaleza con un diccionario". *Cordero* v. *Tribunal*, 72 D.P.R. 378, 386. Resolvemos que los autos contienen evidencia sustancial para basar la conclusión del Consejo al efecto de que Rivera renunció por escrito, para ser efectiva su renuncia en una fecha futura específica.

No hemos pasado por alto ciertos hechos que surgen de los autos y en los cuales descansa el apelante en su alegato. En abril de 1947 hubo una huelga de estudiantes en el Colegio de Agricultura. Como resultado de ella se formularon cargos a Rivera por el Vicerrector y fueron vistos ante el Rector. Éste destituyó a Rivera, quien apeló para ante el Consejo. La decisión del Rector fué revocada por el Consejo, el cual ordenó una nueva audiencia. El 25 de noviembre de 1947, luego de celebrar una conferencia con el Vicerrector y con Rivera, el Rector archivó los cargos y anunció públicamente que Rivera se dedicaría a escribir su libro. En la misma fecha el Rector escribió a Rivera encomendándole "las tareas de Catedrático de Biología adscrito a la Estación Experimental Agrícola de la Universidad de Puerto Rico . . .". El 19 de diciembre de 1947 el abogado de Rivera contestó la carta del Rector diciendo que Rivera no necesitaba nuevo nombramiento para ir a la Estación Experimental y que aceptar uno podría arriesgar su *status* como profesor permanente y su derecho a sus sueldos por el período de su suspensión en lo que se ventilaban los cargos. El Rector replicó el 30 de diciembre de 1947 que su carta no suponía un nuevo nombramiento sino una encomienda de nuevas tareas. Durante el año siguiente Rivera fué adscrito a la Estación Experimental con licencia con paga para que pudiera escribir su libro.

No podemos seguir el argumento de Rivera al efecto de que esta cadena de sucesos dejó en alguna forma sin efecto la renuncia comprendida en su carta del 15 de febrero de 1947.

El Consejo tenía derecho a concluir que a lo sumo demostraba su preocupación por sueldos atrasados y por su *status* de profesor permanente durante el resto de su licencia.   Nada hay en los autos que contenga la más mínima sugestión de que la renuncia de Rivera no sería efectiva como se planeó originalmente.   Y los autos contienen suficiente evidencia de la aceptación de la renuncia de Rivera, la cual aceptación, como ocurrió aquí, no tenía que ser formalmente por escrito, pero se puede inferir de las circunstancias concurrentes y de la conducta de las partes, incluyendo la aceptación por Rivera del término y condiciones de su licencia, el abandono de Rivera de sus deberes de enseñanza y la selección de su sucesor.   *Pace* v. *The People, ex rel,* 50 Ill. 432 (1869) ; *Murray* v. *State,* 89 S. W. 101 (Tenn., 1905) ; *State* v. *Board of Education,* 189 P. 915 (Kans., 1920) ; *Edwards* v. *United States,* 103 U. S. 471; *Rogers* v. *Carleton,* 110 P. 2d 908 (Okla., 1941) ; Mechem, *Public Offices and Officers,* págs. 264–5; Anotación, 95 A.L.R. 215.   Cf. *Luce & Co.* v. *Junta Relaciones Trabajo,* 71 D.P.R. 360, 372–77.   Nada encontramos en el artículo 208 del Código Político que exija una decisión contraria.(⁶)

En vista de lo anterior, el tribunal inferior no cometió error al resolver que no existía controversia real alguna en cuanto a algún hecho esencial en este caso, con respecto a si Rivera había renunciado su cargo, y tampoco erró al declarar con lugar la moción del Rector para que se dictara sentencia como cuestión de derecho.   *Fernández* v. *Corte,* 71 D.P.R. 161; *Sucn. Guerra* v. *Sánchez,* 71 D.P.R. 807.(⁷)

*La sentencia del tribunal de distrito será confirmada.*

---

(⁶) Creemos conveniente indicar que las gestiones realizadas por las partes en relación con la alegada renuncia, son cuestiones de hecho, con respecto a las cuales son concluyentes las conclusiones de hecho del Consejo, de estar éstas sostenidas por evidencia sustancial.   Pero este Tribunal debe determinar en última instancia si tales hechos, tal cual los encontró probados el Consejo, constituyen una renuncia como cuestión de derecho.   Véase *Davis,* supra, pág. 868 *et seq.*

(⁷) Los señalamientos restantes están comprendidos en la discusión anterior, excepto la contención del apelante de que los artículos 207 y 208 del

Código Político son aplicables a los profesores de la Universidad de Puerto Rico y que de los autos no surge que Rivera presentara su renuncia por escrito, según lo exigen dichos artículos.  No nos detenemos a determinar si los artículos 207 y 208 se aplican a profesores de la Universidad de Puerto Rico.  *Cf. Maura* v. *Junta de Pensiones,* 49 D.P.R. 860; *Pereda* v. *Padín,* 49 D.P.R. 948; *State* v. *Ford,* 151 P. 2d 171 (Mont., 1944); *White* v. *Board of Regents,* 141 S. W. 414 (Ky., 1911); *Jacobs* v. *School Dist.,* 50 A. 2d 354 (Pa., 1947); *Enzor* v. *Faircloth,* 43 S. 2d 811 (Ala., 1949); *Sirmon* v. *Roberts,* 191 S. W. 2d 824 (Ark., 1946); Throop, *Public Officers,* secs. 407–30.  Nuestra conclusión de que Rivera renunció por escrito hace académica esa cuestión.